## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ISMETA KADRIBASIC,

     Plaintiff,

v.

WAL-MART INC.,

     Defendant.

Civil Action No.: 1:19-cv-03498-SDG-CCB

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff was a fifteen-year Walmart employee (2003-2018) that received eight promotions, rising from part-time cashier to manager of the entire Snellville Sam's Club. In March 2017, Walmart promoted her to the larger (but troubled) Duluth location to help solve the club's "challenges." In February 2018, for her first year of work at Duluth, Walmart awarded Plaintiff a six-figure ($107,000+) bonus.

In April 2018, Plaintiff came under District Manager Angela Taylor's supervision. Ms. Taylor does not like it when managers take leave. (Melson Dep. 95:17-96:19[1]; Kadric 1 Dep. 77:15-82:25). This is because her stores are "charged"

---

[1] All depositions have been filed on the docket and citations to depositions follow a "page: line" format and cite to the transcript page, not PDF page.

finically for "major losses," including workers' compensation injuries. (Ex. 34 to Taylor Dep.; Taylor Dep. 170:14-171:7).

On October 18, 2018, Plaintiff suffered a serious back injury. If this workers' compensation injury lead to lost time from work, it would result in a "major loss" for Ms. Taylor's store. (Taylor Dep. 170:14-171:7). Plaintiff tried to work through her pain, but in late October and early November 2018, she complained to Ms. Taylor and other co-workers about being in severe pain and needing to visit the emergency room. Although Plaintiff provided Ms. Taylor with sufficient information such that she should have recognized that Plaintiff needed leave that could be FMLA-qualifying, Walmart failed to notify Plaintiff of her eligibility to take FMLA leave (contrary to law and its own policy). Similarly, Walmart did not offer Plaintiff a leave accommodation under the ADA (contrary to law).

After Plaintiff began missing work due her injury on November 5 and 6, on November 6, Ms. Taylor and a co-manager exchanged text messages worrying that Plaintiff's up-coming leave would result in a financial "**charge**" to the store that would be a "**major loss**."[2]

Almost immediately, on November 8th and 9th, Ms. Taylor issued three

---

[2] This refers to charges levied by Walmart that go against the club's bottom-line when employees miss time due to work injuries. (Keasler Dep. 23:8-25:20; Harbel Dep. 24:18-25:11).

disciplinary actions (called coachings) against Plaintiff. Several other Walmart managers testified they had never seen a situation where an employee received more than one disciplinary action in a day, let alone three in thirty-six hours.

Each of the three supposed rule violations are provably pretext: one occurred more than four months prior and had been largely ignored until Plaintiff needed disability leave, one occurred three weeks prior and involved no rule violation at all, and one involved actions taken *by other employees* (not Plaintiff), none of whom were disciplined (or even interviewed). Further, in all three situations, others (who were not seeking leave) committed comparable rule violations without discipline.

Not surprisingly, Ms. Taylor contradicted herself under oath on numerous material instances. Having been so impeached, her testimony is worthless to Walmart at summary judgment.

Walmart's actions in denying FMLA leave, denying ADA accommodations, and terminating Plaintiff because of her disability and resulting request for an accommodation of leave justify the grant of summary judgment for Plaintiff.

## FACTS

A timeline of key events is helpful to understanding this case:

**2003**: Walmart hired Plaintiff as a part-time cashier. (Kadribasic Dep. 43:6-11; Ex. 2 to Kadribasic Dep.). Over the next ten years, Walmart promoted her eight times and ultimately made her the head manager of the Snellville Sam's Club in

2013. (Kadribasic Dep. 43:21-52:17; Ex. 2 to Kadribasic Dep.).

**March 2017**: Walmart again promoted Plaintiff to club manager of the Duluth Sam's Club because she was doing a "great job" in Snellville. (Lowe Dep. 20:2-25, 93:18-93:16; Kadribasic Dep. 54:3-55:6). Duluth was a larger club than Snellville (Kadribasic Dep. 55:1-4) and the promotion came with a substantial pay raise (Ex.1, Pay Data). When Plaintiff started at Duluth, the club was in bad shape and was a "challenging store." (Lowe Dep. 20:12-25; Martin Dep. 10:15-18).

**February 2018**: Walmart terminated five "poor performing" club managers in the Atlanta area. (Lowe Dep. 94:16-95:5; Kadribasic Dep. 83:8-22; Keasler Dep. 8:14-22; Taylor Dep. 59:13-16, 61:4-23). Walmart **did not** terminate Plaintiff's employment. (Taylor Dep. 63:18-22). Instead of terminating her employment, in February 2018, Walmart paid Plaintiff a bonus of $107,830.18 for her good performance at Duluth. (Ex. 2, Bonus, Kadribasic Dep. 220:14-221:19).

**March 2018**: One year after Plaintiff's start as the Duluth Sam's Club manager, the club was in a better place than when she took over and was the club "moving in the right direction." (Lowe Dep. 21:1-22:17, 97:6-15; Martin Dep. 34:22-35:6, 38:11-17, 38:21-39:1).

**April 2018**: Angela Taylor look over as manager of the Atlanta market. (Taylor Dep. 12:2-5). Ms. Taylor had a reputation for not liking managers who took leave. (Melson Dep. 95:17-96:19; Kadric 1 Dep. 77:15-82:25). Ms. Taylor

immediately assigned a co-manager to assist Plaintiff "because [she was] pregnant." (Kadribasic Dep. 201:22-202:22; 290:10-291:6).

**April, June, and August 2018**: Plaintiff raised complaints that Ms. Taylor retaliated against her because of her upcoming maternity leave. (Kadribasic Dep 194:4-195:1, 204:5-206:2).[3]

**June 26, 2018**: An incident occurred at Plaintiff's club wherein one set of doors may have been left unlocked for six minutes at a time when the doors should have been locked. Store photographs show an employee locking the doors less than six minutes after Plaintiff left the club. (Ex. 22 to Taylor Dep. (compare p. 5 and p. 6); Kadribasic Dep. 317:6-320:21). Plaintiff discussed this with Walmart managers on July 10 and was not issued a disciplinary coaching. (Ex. 37 to Kadribasic Dep., p. 7-8, Kadribasic Dep. 316:20-317:2). Plaintiff met with Ms. Taylor about this on July 12 and again Ms. Taylor did not discipline Plaintiff. (Kadribasic Dep. 197:1-198:24). Later, Manager Harbel similarly left the tire center door unlocked and was not disciplined. (Martin Dep. 98:13-99:5).

**July 13-October 8, 2018**: Plaintiff was on maternity leave. While on maternity leave, Marvin Ramsey ran the Duluth. Plaintiff returned to work on

---

[3] This earlier claim of retaliation for pregnancy leave is not part of this litigation and was resolved at the EEOC level.

5

October 9 to find the club "falling apart." (Kadribasic Dep. 212:21-23; Kadric 1 Dep. 19:2-21:5, 27:19-28:7). Nearly ninety photographs taken by Plaintiff document this. (Kadribasic Dep. 232:13-236:5, 360:24-361:8; Ex. 23 to Taylor Dep.; Taylor Dep. 45:2-46:1). At least half of the photographs show Walmart standards violations. (Harbel Dep. 12:8-14:6; *see also* Taylor Dep. 44:10-45:1). Ramsey did not properly merchandise or stock the endcaps, which affected profitability, nor did he complete necessary paperwork. (Kadric 1 Dep. 23:11-25:9; Melson Dep. 15:18-21:21).

Plaintiff sent the 90 photographs to Ms. Taylor within the first week of returning from maternity leave. (Kadribasic Dep. 232:13-234:3). However, when alerted to this by Plaintiff, Ms. Taylor did not investigate or discipline Ramsey; and later promoted him. (Taylor Dep. 47:23-48:17, 50:1-14).

**October 18, 2018**: About ten days after returning from maternity leave, Plaintiff injured her back while pushing a pallet of merchandise. (Kadribasic Dep. 212:24-213:1). That day, Plaintiff reported her injury to a salaried member of management named Ms. Kadric and completed the written associate incident report required by Walmart policy. (Kadribasic Dep. 239:14-240:17; Ex. 28 to Kadribasic Dep.). Further, Kadric emailed other relevant managers (including Ms. Taylor) about this injury. (Kadric 1 Dep. 30:23-33:1).[4] Neither Ms. Taylor nor anyone emailed

---

[4] Plaintiff alleges that Walmart destroyed this email and is seeking spoliation

back, or timely complained about any alleged rule violation.

**October 21, 2018**: Plaintiff emailed Ms. Taylor regarding her injury (Ex. 30 to Kadribasic Dep.). Taylor responded without mentioning an rule violation. (*Id*.).

**October 29, 2018**: Ms. Taylor witnessed Plaintiff have a "break down" and Plaintiff told Ms. Taylor about needing leave due to her severe pain. (Taylor Dep. 150:12-151:2). Ms. Taylor sent a text message saying Plaintiff "just had a breakdown with me so be ready…" (Ex. 3, Breakdown Text). Still, Ms. Taylor said nothing about any rule violations, FMLA rights, or ADA accommodations.

Also, on October 29, Plaintiff went to a doctor's appointment for her injured back. (Ex. 31 to Taylor Dep). Following her appointment, Plaintiff texted to Ms. Taylor, "I just finished with the Dr. going home – I am in an incredible amount of pain…The dr. referred me to specialists and ordered an MRI. **My restrictions still remain the same**." (Ex. 29 to Taylor Dep) (emphasis added).

**November 5, 2018:** Plaintiff misses work for physical therapy. (Ex. 5, p. 24).

**November 6, 2018**: Plaintiff texts Ms. Taylor, "I had physical therapy yesterday and I am in a lot of pain this morning…I don't think I will make it to work today." (Ex. 4, Text Messages, p. 12). Ms. Taylor did not inform Plaintiff of her FMLA rights or offer any ADA accommodations.

---

sanctions for same. (Doc. 67).

A few minutes later, Ms. Taylor texted a loss prevention co-worker linking Plaintiff's injury to discipline: "Tina is constantly saying she is in pain and not working. How should we proceed with her? I'm going to have James enter the third-level coaching into the system." (Ex. 34 to Taylor Dep.; Taylor Dep. 163:16-165:17). Ms. Taylor raised discipline but not FMLA leave or ADA accommodations.

Later that day, the loss prevention co-worker texted Ms. Taylor discussing the financial impact Plaintiff's upcoming leave would have on the club saying: "**She is going to cause us major los[s]**. This will be the first thing I will work on tomorrow." (Ex. 34 to Taylor Dep.; Taylor Dep. 169:21-171:25) (emphasis added). "This will be the first thing I work on" references searching for a disciplinary action, a discriminatory motive, and specifically posits attendance.

**November 7, 2018**: Plaintiff visits her orthopedist and is not at work. (Ex. 50 to Kadribasic Dep; Kadribasic Dep. 366:17-367:4).

**November 8, 2018**: Plaintiff, Ms. Taylor, and Kadric meet at the Duluth club; they conduct a "walk through" of the club's preparation for a "One Day" sales event that is to occur on the coming Saturday, November 10. (Kadribasic Dep. 367:5-369:15; Kadric 1 Dep. 45:22-47:15, 53:16-54:1). Ms. Taylor comments that the club looked "amazing." (Kadric 1 Dep. 53:24-25; Taylor Dep. 177:14-22, 179:12-16). Ms. Taylor reviewed the "One Day" sales event binder and approved this binder. (Kadribasic Dep. 275:12-276:10, 377:20-25; Kadric 1 Dep. 49:7-52:18; Taylor Dep.

8

183:20-184:2). During the walkthrough, Plaintiff had a hard time walking and was sweating. (Kadric 1 Dep. 48:16-20). Plaintiff asked for a break twice and Taylor says "not now." (Kadric 1 Dep. 47:16-49:1; Kadribasic Dep. 180:8-181:2).

Plaintiff later tells Ms. Taylor of her back pain and need for leave. (Kadribasic Dep. 135:2-136:10, 185:16-22, 191:10-19, 271:9-272:13).

Later on October 8, Plaintiff went to physical therapy, the orthopedist, and ultimately the emergency room. (Kadribasic Dep. 378:1-15; Ex. 5, p. 8-23). Plaintiff told Ms. Taylor about her ER visit. (Taylor Dep. 190:20-191:25; Ex. 4, p. 13).

The emergency room physician told Plaintiff that she should not work on Friday, November 9. (Ex. 50 to Kadribasic Dep.; Kadribasic Dep. 378:17-380:1). Plaintiff made Ms. Taylor aware, and Ms. Taylor did not object. (Ex. 4, p. 13).

**November 8-9, 2018**: Within a thirty-six hour period, Ms. Taylor issued Plaintiff three disciplinary coachings and terminated her employment. (Kadribasic Dep. 369:18-24; 409:3-412:10). In the eight years prior to 2018, Plaintiff received zero disciplinary coachings. (Ex. 6, Responses to First RFAs).

## ARGUMENT

### 1. <u>FMLA Interference</u>

Plaintiff seeks summary judgment on Walmart's liability for interfering with her FMLA rights by (a) failing to notify her of her eligibility and failing to ascertain whether the employee's absence qualifies for FMLA protection, (b) failing to allow

her to take her entitled leave, and (c) denying her job restoration. The facts are undisputed that Walmart did not meet or attempt to meet any of these FMLA requirements and as such this is ripe for summary judgment.

The FMLA confers rights on eligible employees to twelve weeks of leave due to "a serious health condition," 29 U.S.C. § 2612(a)(1)(D), and to job restoration at the end of leave, § 2614(a)(1). When the employer "acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer **must notify** the employee of the employee's eligibility to take FMLA leave..." 29 C.F.R. § 825.300(b)(1) (emphasis added). Walmart undisputedly did not do that here.

An employer's FMLA obligations are triggered when an eligible employee with a serious health condition puts the employer on notice that the FMLA may apply. *See* 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 825.303. To prove FMLA interference, the "employer's motives are irrelevant" and Plaintiff only must demonstrate that she was denied an entitled benefit. *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001).

Walmart admits Plaintiff had three-quarters of her FMLA leave remaining at the time of her termination. (Ex. 21 to Taylor Dep., p. 11 (eight weeks available); *see also* Doc. 8, ¶¶ 3, 68-69 (admitting eligibility); Kadribasic Dep. 95:6-12 (worked 1,250 hours)). The Plaintiff undeniably had a serious health condition. *See infra* at p. 16; *see Aboukora c. Keebler Co.*, 2006 WL 839238, at *7 (M.D. Ga. 2006)

(finding serious health condition from history of back pain, periodic visits to physician, and treatment with prescription medication).

With unforeseeable FMLA leave, as here, "'the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a *potentially FMLA-qualifying reason*.'" *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005) (emphasis supplied). The employee is not required to "expressly" invoke the FMLA. *Id*.; 29 C.F.R. § 825.303(b).

Once the employee provides "sufficient notice to her employer that potentially FMLA-qualifying leave is needed," the employer bears the burden of ascertaining whether the employee's absence qualifies for FMLA protection. *Cruz*, 428 F.3d at 1383 (*citing Strickland*, 239 F.3d at 1209); 29 C.F.R. § 825.303(b). "'[W]hen the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days…'" *Crawford v. City of Tampa*, 464 Fed. Appx. 856, 857 *1 (11th Cir. 2012) (*quoting* 29 C.F.R. § 825.300(b)(1)). Failing to provide notice to its employees may constitute FMLA interference. *Id*. (*quoting* 29 C.F.R. § 825.300(e)).

Ms. Taylor admits that Plaintiff provided adequate notice under the FMLA. On October 28 or 29 Plaintiff and Ms. Taylor had an in-person conversation at the Duluth club where Plaintiff broke down, started crying, telling Ms. Taylor she was

in pain due to her back. (Taylor Dep. 149:10-151:3; Kadribasic Dep. 132:2-134:17, 177:21-178:12, 185:5-15, 346:23-350:3). Ms. Taylor was aware that Plaintiff went to the doctor and physical therapy "quite a bit." (Taylor Dep. 154:17-157:12, 225:20-226:2). Plaintiff also told Ms. Taylor that she had problems walking and that her back hurts whether she walks or sits. (Taylor Dep. 156:6-15).

Also following the November 8 walk through Plaintiff asked Ms. Taylor for leave for her back injury. (Kadribasic Dep. 135:2-136:10, 185:16-22, 191:10-19, 271:9-272:13). That night, Plaintiff informed her workers' compensation adjuster, an agent of Walmart, of the hard time that she was having with Ms. Taylor and need for leave. (Kadribasic Dep. 135:12-16, 276:21-277:15). On November 9, Plaintiff sent a text message to Ms. Taylor asking for leave because of "horrible" pain that caused her to keep "calling out." (Kadribasic Dep. 136:1-6, 185:24-186:3, 191:22-193:4, 390:13-391:14). That afternoon, Plaintiff also submitted a request for FMLA leave on Sedgwick. (Kadribasic Dep. 132:2-133:20, 414:6-16).

Ms. Taylor admits she did not notify Plaintiff of her FMLA rights. (Taylor Dep. 152:25-154:8). This is in contravention of the law and Walmart policy, which requires that Ms. Taylor "recognize when associate's request for time off for an FMLA-qualifying circumstance and direct them to contact Sedgwick." (Ex. 18 to Taylor Dep.; Taylor Dep. 16:22-18:22). By failing to notify Plaintiff of her eligibility for FMLA after acquiring knowledge that her leave may be for an FMLA qualifying

reason, Walmart interfered with Plaintiff's FMLA rights. Had Walmart complied with its notice obligations, Plaintiff would have been on protected intermittent FMLA leave during her multiple doctors' visits the week of her termination, including the day of her termination. By terminating Plaintiff when she had eight weeks of FMLA leave remaining and when she provided Walmart with sufficient information of her serious health condition, Walmart interfered with her right to leave and also to reinstatement. 29 U.S.C. § 2614(a)(1).

   2. <u>ADA Reasonable Accommodation</u>

   Walmart violated the ADA's reasonable accommodation requirement when the company failed to accommodate Plaintiff with a leave of absence and proceeded to fire her for allegedly failing to perform her job *during a time when she should have been on ADA protected leave*.[5] In the context of a failure-to-accommodate claim, an employer discriminates by "not making reasonable accommodations to the known physical… limitations of an otherwise qualified individual… unless [the employer] can demonstrate that the accommodation would impose an undue hardship..." *Hill v. Clayton Cty. Sch. Dist.*, 619 Fed. Appx. 916, 920 (11th Cir. 2015) (citation omitted). Reasonable accommodations "include permitting the use of

_____

[5] For the reasons described below, Plaintiff denies that the club was unprepared, but even assuming it was, Walmart still violated the ADA.

accrued paid leave or providing leave for necessary treatment." *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1225 (11th Cir. 1997) citing Appendix to C.F.R. § 1630.2(o). Leave is a "reasonable" accommodation when it allows the plaintiff to perform his essential job functions presently "or in the immediate future." *Id.* at 1226 (discussing leave for "a month or two").

Here, Plaintiff requested "**a couple of weeks**" leave on October 28/29, November 8, and November 9 and attended doctors' visits for her disability on three of her last five workdays. *See supra,* pp. 7-9, 11-12; Kadribasic Dep. 277:5-12. Walmart denied these requests (Kadribasic Dep. 391:18-393:5), required Plaintiff to continue to work, and then shortly thereafter terminated her employment. Had Walmart accommodated Plaintiff, she would have been on ADA leave during her multiple doctor's visits the week of her termination and the day of her termination.

The Eleventh Circuit acknowledges that, "[a]llowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262–63 (11th Cir. 2007). An employer cannot use the consequences of its failure to accommodate as a basis upon which to terminate Plaintiff, and doing so constitutes direct evidence of unlawful disability discrimination under the ADA. *See EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435-436 (6th Cir. 2018) ("a company may not illegitimately deny an employee a

reasonable accommodation to a general policy and use that same policy as a neutral basis for firing him."). The Sixth Circuit used the following hypothetical to explain this concept: a school that lacked an elevator to accommodate a teacher with mobility problems could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class because it took him too long to climb the stairs. *Id.* Hence "failure to consider the possibility of reasonable accommodation for known disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities." *Id.* (citation omitted)*; Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995). "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1140 (9th Cir. 2001).

Here, Walmart cannot deny Plaintiff the reasonable accommodation of ADA protected leave and then fire her because her repeated doctor visits inhibited in her ability to prepare for the "One Day" sales event during a time when she should have been on ADA protected leave.

3. Termination in violation of the ADA

Ms. Taylor terminated Plaintiff in violation of the ADA in retaliation for requesting leave because she believed Plaintiff's leave would result in a "major

loss." To establish a *prima facie* case of ADA discrimination, Plaintiff must show (1) she was disabled, (2) she was qualified, and (3) she was subjected to unlawful discrimination because of her disability. *Holly*, 492 F.3d at 1255-56.

First, Plaintiff was disabled. The ADA defines an actual disability as an "impairment that substantially limits one or more of the major life activities…" 42 U.S.C. 12102(1). Here, Plaintiff's back injury progressively worsened from October 18 – November 9 and substantially limited at least her ability to sleep, walk, and do household tasks. (Kadribasic Dep. 216:19-219:9; Taylor Dep. 229:3-17; Ex. 5).

Second, Plaintiff was qualified because "with or without reasonable accommodation, [she could] perform the essential functions of the employment position. . . " 42 U.S.C. § 12111(8). Here, Plaintiff performed the essential functions of her position, (Melson Dep. 26:2-18; Kadribasic Dep. 170:17-176:9; Kadric 1 Dep. 38:9-39:16) on the day before her termination, and could have continued performing that job with a short-term leave accommodation or other accommodation.

Finally, Walmart subjected Plaintiff to unlawful discrimination when it terminated her employment because it believed her disability would decrease the club's profitability. Contemporaneous documents show the profit motive. Three days before Plaintiff's termination, conversations with Ms. Taylor described Plaintiff's need for leave as causing a "major los[s]" to the store's profitability. (Ex.

34 to Taylor Dep., p. 2; Taylor Dep. 170:14-171:7).[6] Ms. Taylor knew that "the accident cost [for Plaintiff] is going to be great" and resulting diminished profitability decreased her bonus eligibility. (Taylor Dep. 19:1-19, 24:6-25:11, 170:2-171:7). Another text connects Plaintiff's pain and need for leave with disciplinary actions, (Ex. 34 to Taylor Dep., p. 1) which "strongly suggests the possibility of a search for a pretextual basis for discipline" and *Hairston v. Gainesville Sun Publ'g Co*., 9 F.3d 913, 921 (11th Cir. 1993) (citation omitted).

Second, the disciplinary actions reflect a major divergence from Walmart policy with respect to issuing three coachings within thirty-six hours, a four-month delay for one of the actions, and a complete absence of investigation with another. *See Village of Arlington Heights v Metropolitan Housing Dev Corp.,* 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role [in the disputed action].").

Third, intentional discrimination can be inferred from pretext because "once the employer's justification has been eliminated, discrimination may well be the

---

[6] The profit motive expressed in the contemporaneous text messages is "significant" evidence of pretext. *See Jones v. Bessemer Carraway Medical Ctr.,* 151 F.3d 1321, 1323 n. 11 (11th Cir.1998) (holding that "[l]anguage not amounting to direct evidence, but showing some racial animus, may be *significant* evidence of pretext once a plaintiff has set out a prima facie case") (emphasis added).

most likely alternative explanation …" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) (citation omitted). Walmart presents three reasons for Plaintiff's termination, all of which emanate from Ms. Taylor, who was impeached multiple times in her deposition. All three of the proffered reasons are pretextual:

**The first item presented is the unlocked doors**. Ms. Taylor disciplined Plaintiff on <u>November</u> 8 because four months earlier on <u>June</u> 26 she "failed to ensure that the outside and inside entrance door was deadbolted." (Ex. 28 to Taylor Dep.). This unexplained delay evidences pretext. *See E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC*, 2007 WL 602212, at *23 (N.D. Ga. Feb. 16, 2007). Pretext is also shown because it is inconsistent with Walmart policy, which is to "to give a coaching soon after the bad activity occurred." (Lowe Dep. 98:19-99:13); *Village of Arlington Heights,* 429 U.S. at 267. Four long-tenured managers testified that a four-month delay is highly atypical. (Mathews Dep. 5:19-6:2, 8:20-10:8 (15 year manager); Martin Dep. 7:22-25, 87:2-88:18 (12 year manager); Harbel Dep. 55:24-56:18 (15 year manager); (Keasler Dep. 16:23-19:1 (22 year manager aware of one multi-month sexual harassment investigation). Walmart is not able to explain its delay.

If the unlocked doors warranted coaching, Walmart had ample opportunity to discipline Plaintiff. Instead, Walmart's delay evidences that it was not "truly concerned" about the issue. *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 692–93 (7th Cir. 2007). Here, the investigation

18

completed around June 30. (Ex. 22 to Taylor Dep. (transmitting the investigation PDF on June 30); Taylor Dep. 92:12-15). Plaintiff met with market-level managers on July 10 to discuss the doors but was **not** coached. (Ex. 37 to Kadribasic Dep., p. 14, Kadribasic Dep. 316:20-317:2;). Plaintiff walked through the club with Ms. Taylor on July 12 and again was **not** coached. (Kadribasic Dep. 197:1-198:24).

Ms. Taylor repeatedly gave false testimony under oath regarding the date and circumstances of this coaching. At Plaintiff's workers compensation deposition, Ms. Taylor testified that she coached Plaintiff for failing to lock the door *before* her October 18 injury. (Taylor Dep. 81:1-15; Exhibit 20 to Taylor Dep. 27:17-28:10, 44:16-21, 48:17-25; Taylor Dep. 83:10-84:22). There, Ms. Taylor had a motive to disprove causation between the injury and the coaching by contending that the coaching occurred before the injury. Then, in this litigation as documents were produced, Ms. Taylor swore in verified interrogatories that she coached Plaintiff on October 29 for the unlocked doors. (Ex. 21 to Taylor Dep., p. 5; Taylor Dep. 86:17-88:21). Here, Ms. Taylor's motive was to create more separation in time between the unlocked door coaching and subsequent coachings. But deeper production of ESI later revealed that Taylor coached Plaintiff for the unlocked doors after her injury and within thirty-six hours of her termination. (Taylor Dep. 88:22-90:25).

Ms. Taylor also gave false testimony on her involvement in the unlocked door coaching to create the perception that she was not involved in all of Plaintiff's

discipline. "I was not a part of sitting in on this coaching." (Ex. 20 to Taylor Depo., 28:11-29:10). "The Second Coaching was given to Plaintiff by Darryl Stinson and Katie Parker was a witness." (Ex. 21 to Taylor Dep, p. 5; Taylor Dep. 107:4-24). In fact Stinson and Parker met with Plaintiff on July 10 and did <u>not</u> coach her. (Kadribasic Dep. 316:20-317:2; Ex. 37 to Kadribasic Dep., p. 14). In actuality, Ms. Taylor was the only manager in the room with Plaintiff for the unlocked door coaching and Stinson joined via telephone. (Taylor Dep. 106:2-9).

Finally, Ms. Taylor's treatment of Plaintiff is inconsistent with her treatment of Harbel, who left the tire center door unlocked. (Martin Dep. 98:13-99:5). *See Haines v. Cherokee Cty,* 2010 WL 2821853, at *26 (N.D. Ga. Feb. 16, 2010) (comparators are "one way" of proving discriminatory intent).

No reasonable jury could believe that the June door incident was a cause of the Plaintiff's termination in November.

**The second item concerns reporting Plaintiff's injury**. On November 9, Ms. Taylor coached Plaintiff because "she didn't report the accident. She had the accident on [October] 18th. She didn't report it until [October] 21st. That's what the coaching is about. Has nothing to do with all the other stuff." (Taylor Dep. 116:19-120:4; Ex. 20 to Taylor Dep. 43:3-44:11; Ex. 25b to Taylor Dep.) (abandoning other issues in the coaching).

This proffered reason is pretextual because Plaintiff did not violate the

reporting rule. When an employer asserts that the employee violated a work rule, an employee may show pretext "by showing either that she did not violate the work rule..." *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1563 (11th Cir. 1987). In *Sparks* pretext was shown when an employer construed a work rule in an implausible manner, and the employer had no evidence that it previously construed the rule in that manner. *Id.* at 1563-1564.

Here, the same facts are present. Any reasonable reading on the policy shows no rule violation. The policy requires that employees report injuries "to their supervisor **or a member of management**." (Ex. 30 to Taylor Dep.) (emphasis added). Plaintiff satisfied the policy by notifying Kadric, a member of management, on the day of the incident. (Taylor Dep. 131:23-25, Kadric 1 Dep. 33:2-14, 35:14-21). Then, the day of the incident, Kadric emailed the market-level managers informing them of Plaintiff's injury. (Kadric 1 Dep. 30:21-33:1, 121:21-122:18, 123:20-124:11). Further, Walmart presented no evidence in discovery that Taylor previously construed the rule in such a manner.

So where is the rule violation? Walmart does not explain. And if there was a rule violation, why was Kadric (who was the member of management that took the injury report) not disciplined[7] instead of Plaintiff? Walmart does not explain. It was

---

[7] Ms. Taylor never contacted or disciplined Kadric for submitting the IRS report

21

Kadric's responsibility to enter the injury into the electronic IRS system. (Taylor Dep. 134:11-18). Walmart policy prohibited Plaintiff from entering the injury into IRS. (Taylor Dep. 128:9-15; Mehic Dep. 16:3-23; Keasler Dep. 20:14-22, 21:8-14). So how could Plaintiff be disciplined for <u>not</u> doing something she <u>was prohibited from</u> doing? Walmart does not explain.

And similar to the above, the delay shows pretext. *Brown v. Diversified Distribution Sys., LLC*, 801 F.3d 901, 910 (8th Cir. 2015) ("where an employer has known about its stated reason for taking adverse action against an employee 'for an extended period of time,' but only acts after the employee engages in protected activity, the employer's earlier inaction supports an inference of pretext" (citation omitted)). Ms. Taylor did not have a problem with Plaintiff's reporting until after she requested leave. Plaintiff emailed Ms. Taylor and Stinson on October 21 notifying them of her October 18 accident. (Ex. 26 to Taylor Dep.). Taylor did not respond that Plaintiff violated a rule but said, "I hope you get better soon." (*Id.*).

**The third proffered reason is that Plaintiff did not prepare for a "One Day" sales event**. Pretext is shown regarding this item for three reasons. First, Plaintiff properly prepared for the sale. Second, comparators that made errors but

---

three days after Plaintiff's injury. (Kadric 1 Dep. 36:13-38:8). Nor was any investigation performed. (Kadribasic Dep. 404:24-406:6).

were not disciplined. Third, deviation from standard policy.

First, testimony denying Ms. Taylor's description of the store's preparation (including Plaintiff's testimony) is evidence of pretext. The plaintiff's testimony "flatly" denying "specific allegations of his store's poor condition" was found to be evidence of pretext, when the supervisor "told him in the course of *direct* conversations, that he was doing a good job". *Damon v. Fleming Supermarkets Of Fla., Inc.*, 196 F.3d 1354, 1364 (11th Cir. 1999).

Here, the Duluth Club was prepared for the sale. (Kadric 2 Dep. 33:3-10). Ms. Taylor testified that the store looked "amazing" the day before Plaintiff's termination. (Kadric 1 Dep. 45:22-52:19, 53:16-54:1; Kadribasic Dep. 275:12-276:10, 367:5-369:15, 377:20-25; Taylor Dep. 177:14-179:16, 183:20-184:2).

Plaintiff started the preparation efforts by holding a staff meeting on October 30 to discuss preparation for the "One Day" sales event, (Kadric 1 Dep. 39:17-41:15). This was appropriate preparation. (Keasler Dep. 31:3-12, 33:24-34:20; Mathews Dep. 25:18-26:6). In the following days, Plaintiff sent a number of "appropriate" instructions over email to prepare the club for the "One Day" sales event. (Harbel Dep. 61:18-66:22, 74:20-76:23; Ex. 42 and 45 to Harbel Dep.). Plaintiff worked with Kadric to obtain the planning information from the Wire. (Kadric 1 Dep. 42:1-9). And they prepared a binder. (Kadric 1 Dep. 60:7-21, 74:8-75:3; Melson Dep. 55:4-56:15, 76:23-78:5, 109:14-24). Plaintiff also appropriately

prepared training action points. (Ex. 5 to Keasler Dep., Keasler Dep. 36:3-39:18).

Throughout the week leading up the "One Day" sales event, Plaintiff had all merchandise organized and timely placed on the sales floor. (Kadric 1 Dep. 43:7-24; Ex. 2 to Melson Dep.; Melson Dep. 29:1-40:5, 49:1-59:18, 64:7-68:10, 70:2-72:24). Third-party managers testified that Plaintiff's preparation was appropriate and timely. (Keasler Dep. 42:17-48:25; Melson Dep. 33:9-35:23). When Ms. Taylor arrived at the Duluth club on November 9, the club was as ready as it was supposed to be. (Melson Dep. 49:13-53:24, 59:19-24; Kadric 1 62:1-65:19).

Second, if there were any errors in the prep for the One Day sale, others who _were not disciplined_ committed the errors. The testimony of manager Harbel showed that the only area that may not have been "ready" was staffing and the cell phone "pull tickets"; and it was Harbel, not Plaintiff, who was the manager responsible for each. (Harbel Dep. 58:14-59:9, 76:9-80:21; Ex. 5 to Harbel Dep., p. 3).

But Ms. Taylor did not investigate Harbel's responsibility. (Taylor Dep. 223:10-224:23). Nor did Ms. Taylor interview Kadric, Plaintiff, or Melson the overnight manager before deciding to fire Plaintiff. (Taylor Dep. 226:4-227:23). The complete lack of investigation demonstrates pretext. _Wade v. Fla., Dep't of Juvenile Justice_, 2017 WL 6345820, at *2 n. 4 (N.D. Fla. Sept. 21, 2017), _aff'd,_ 745 F. App'x 894 (11th Cir. 2018) ("facts suggesting that the investigation was a sham—for example, if Defendant did not interview key witnesses—could be evidence of

pretext."). Further, Taylor's failure to investigate contravenes Walmart policy and demonstrates pretext. (Ex. 19 to Taylor Dep., Taylor Dep. 77:8-78:16).

In conclusion, pretext is the inescapable conclusion when Plaintiff's fifteen-year career, eight promotions, and six-figure bonus are considered in the context of the close temporal proximity between Plaintiff's request for leave, Taylor's discussion of the major financial loss that her leave would cause, and the three disciplinary coachings in thirty-six hours. There is universal consensus among Walmart's managers that the company's standard practice when two offending behaviors occur within the same proximity of time is to put them on a single coaching – two coachings are not given at the same meeting. (Martin Dep. 6:14-9:1, 85:12-86:15 (twelve years' experience); Keasler Dep. 16:23-17:6, 19:2-22:18 (22 years' experience); Mathews Dep. 5:19-6:2, 10:10-18 (15 years' experience); Mehic Dep. 14:4-15:19 (14 years' experience); Kadribasic Dep. 143:3-147:18). In addition to the deviation from standard practice evidencing pretext, the three rapid-fire coachings evidence pretext because "[t]he failure to warn <u>and thereby given an opportunity for improvement</u> has been considered evidence of pretext." *Evans v. Meadow Steel Prods., Inc.*, 579 F. Supp. 1391, 1395 n.6 (N.D. Ga. 1984) (emphasis added). Walmart terminated a long-term employee who proved her performance though repeated promotions, to avoid a major financial loss rather than offer her leave protected (and required) by both the FMLA and the ADA.

Respectfully submitted this 21st day of July 2020.

/s/ Douglas Kertscher
Douglas R. Kertscher
Georgia Bar No. 416265
Julie H. Burke
Georgia Bar No. 448095

Hill, Kertscher & Wharton, LLP
3350 Riverwood Pkwy.
Suite 800
Atlanta, GA 30339
404-953-0995 (ph.)
404-953-1358 (fax)
drk@hkw-law.com
jb@hkw-law.com

## __CERTIFICATE OF COMPLIANCE__

Undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in local rule 5.1(C) and 7.1(D).

This 21st day of July 2020.

/s/ Douglas R. Kertscher
Douglas R. Kertscher, Esq.
Georgia Bar No. 416265

27

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

ISMETA KADRIBASIC,

     Plaintiff,

v.

WAL-MART INC.,

     Defendant.

Civil Action No.: 1:19-cv-03498-SDG-CCB

## CERTIFICATE OF SERVICE

I hereby certify on this 21st day of July 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

This 21st day of July 2020.

By:   /s/ Douglas R. Kertscher
       Douglas R. Kertscher
       Georgia Bar No. 416265

*Attorney for Plaintiff*