## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**ISMETA KADRIBASIC,**

    **Plaintiff,**

    **v.**

**WAL-MART, INC.,**

    **Defendant.**

**CIVIL ACTION NO.**
**1:19-CV-3498-SDG-CCB**

## FINAL REPORT AND RECOMMENDATION

Plaintiff Ismeta Kadribasic brings this action against Defendant Wal-Mart, Inc., her former employer, asserting claims of retaliation, discriminatory discharge, and failure to accommodate in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, *et seq.*, and a claim of interference in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq*. (Doc. 1). This case comes before the Court on Plaintiff's motion for sanctions, (Doc. 67); Plaintiff's motion for summary judgment, (Doc. 104); and Defendant's motion for summary judgment, (Doc. 107).

For the reasons that follow, the undersigned **RECOMMENDS** that Plaintiff's motion for sanctions, (Doc. 67), be **GRANTED IN PART AND DENIED**

**IN PART**. The undersigned further **RECOMMENDS** that Plaintiff's motion for summary judgment, (Doc. 104), be **DENIED** and that Defendant's motion for summary judgment, (Doc. 107), be **GRANTED** in its entirety.

## I.    BACKGROUND FACTS

### A.    *Standards for Presenting Facts at Summary Judgment*

Unless otherwise indicated, the Court draws the following facts from:

- Plaintiff's "Statement of Material Facts" in support of her motion for summary judgment, (Doc. 104-2);
- Defendant's "Response to Plaintiff's Statement of Material Facts," (Doc. 112-1);
- Defendant's "Statement of Undisputed Material Facts" in support of its cross-motion for summary judgment, (Doc. 107-2);
- Plaintiff's "Responses to Defendant's Statement of Material Facts," (Doc. 111-1);
- Plaintiff's "Statement of Additional Facts That Are Material and Present a Genuine Issue for Trial," (Doc. 111-2); and
- Defendant's "Response to Plaintiff's Statement of Additional Facts That Are Material and Present a Genuine Issue for Trial," (Doc. 118).

Additionally, as indicated and as needed, the Court draws some facts directly from the record. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

For those facts submitted by the moving party on each motion for summary judgment that are supported by citations to record evidence, and that the opposing party has not specifically disputed and refuted with citations to admissible record

evidence showing a genuine dispute of fact, the Court deems those facts admitted under Local Rule 56.1(B). *See* LR 56.1(B)(2)(a)(2), NDGa. ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1).").

The Court has excluded assertions of fact by any party that are immaterial, presented as arguments or legal conclusions, unsupported by a citation to admissible evidence in the record, or asserted only in the party's brief and not the statement of facts. *See* LR 56.1(B)(1), NDGa. ("The Court will not consider any fact: (a) not supported by a citation to evidence…(c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of any party's motion, view all evidence and factual inferences in the light most favorable to the party opposing summary judgment. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005); *see also Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993). The parties dispute some of the proffered facts, but many of those objections are over matters that are not necessarily material to the disposition of this case. The Court will discuss any objections and disputes presented as to the parties' proffered facts only when necessary to do so regarding a genuine dispute of a material issue of fact.

B.    *Material Facts*

1.    *Plaintiff's Employment with Defendant*

Plaintiff was initially hired by Defendant as a part-time cashier in 2003 at the Sam's Club in Snellville, Georgia. (Doc. 111-1 at ¶ 1; Doc. 112-1 at ¶ 1). After serving in various roles between 2003 and 2013, Plaintiff was ultimately promoted to be the club manager of the Snellville Sam's Club in 2013. (Doc. 111-1 at ¶ 2; Doc. 112-1 at ¶ 2). She became the club manager of the Sam's Club in Duluth, Georgia (the Club), in March of 2017. (Doc. 111-1 at ¶ 3; Doc. 112-1 at ¶ 3). Plaintiff's job responsibilities as a club manager included, in relevant part: responsibility for the operation of the facility, providing direction and guidance to members of management and hourly associates, and ensuring planning, execution, and improvement to achieve results at the Club. (Doc. 111-1 at ¶ 5).

4

### 2.   *Plaintiff's First Written Coaching*

In April of 2018, Angela Taylor took over as the market manager for the Atlanta area, which included the Club, and as such became Plaintiff's supervisor. (Doc. 111-1 at ¶ 11; *see also* Doc. 112-1 at ¶ 11). Plaintiff believed that Taylor had a preconceived bias against her, either because Plaintiff did not get along with a Club employee who was friends with Taylor or because Plaintiff had scheduled maternity leave. (Doc. 95 at 298:1-23). After Taylor became the market manager, she scheduled an announced visit to the Club on April 20, 2018, which was the first time Plaintiff and Taylor had met. (Doc. 111-1 at ¶ 18). Prior to entering the Club, Taylor noted that there was trash in the parking lot. *Id.* at ¶¶ 18-19. During this visit, there was trash inside and outside the Club, and the Club's claims cage was not organized. *Id.* at ¶¶ 19-21. When Taylor told Plaintiff about the trash outside the Club, Plaintiff responded that the maintenance associate had called out of work and that the associate who was supposed to clean the claims cage had not done so. *Id.* at ¶ 22. Plaintiff says that Taylor responded that Plaintiff was "making excuses" and "lying." *Id.* Taylor issued Plaintiff a first written coaching on April 20, 2018, which stated that "On 4/20 on an announced visit the outside of the Club was dirty, the receiving dock was dirty, and claims cage was not set according to Company instructions." (Doc. 96-2; *see also* Doc. 111-1 at ¶ 24). As a result of the

first written coaching, Plaintiff felt that her job was threatened and that Taylor wanted to terminate her, and Plaintiff believed that this was because of her upcoming maternity leave. (Doc. 111-1 at ¶ 27).

### 3. Plaintiff's Second Written Coaching

On June 26, 2018, an incident occurred at the Club related to doors being left unlocked when Plaintiff left the night before. (Doc. 111-1 at ¶ 28; Doc. 112-1 at ¶ 15; see also Doc. 96-7). The Court notes that the parties dispute the specifics of what happened with the unlocked doors, and it appears that the parties may be discussing two separate sets of doors at the Club. (See Doc. 107-2 at ¶ 28 (alleging that an associate arrived on the morning of June 26, 2018, to open the Club and found the doors had been left unlocked overnight); Doc. 111-1 at ¶ 28 (disputing Defendant's fact and alleging that photographs show that the doors were left unlocked for only six minutes); Doc. 97 at 100:2-101:16 (Taylor's deposition testimony that the photographs showing doors that were left unlocked for six minutes do not show the front doors, which "were unlocked all night long").[1] Nonetheless, the Court finds that the specific details of which doors were left

_____

[1] The page numbers of Taylor's deposition do not line up with the blue CM/ECF header page numbers. (See Doc. 97). The Court cites to the CM/ECF page numbers.

6

unlocked and for how long are not material to the cross-motions for summary judgment. The parties do not dispute that there was an incident involving unlocked doors on June 26, 2018, that resulted in discussions between Plaintiff and her supervisors.[2]

On July 2, 2018, Taylor emailed Alejandro Figueroa Munoz, an Ethics Investigator for Defendant, and informed him that she planned "on giving [Plaintiff] a next level coaching tomorrow." (Doc. 96-7 at 1; *see also* Doc. 111-1 at ¶ 31). On July 10, 2018, Plaintiff discussed the door-locking situation with Darryl Stinson, one of her supervisors, and Katie Parker, and she was not issued a

---

[2] The Court further notes that Plaintiff, in her response to Defendant's statement of material facts, objects to many of Defendant's facts related to the locked doors incident on the basis that the facts rely on documents containing hearsay (specifically, out-of-court statements of other employees). (*See, e.g.,* Doc. 111-1 at ¶ 28). "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. Nevertheless, a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (citation and internal quotation marks omitted).While it is true that some of the statements, in their current form, would be inadmissible hearsay if offered to prove the truth of the matter asserted, these statements could easily be reduced to admissible form by "hav[ing] the hearsay declarant testify directly to the matter at trial." *Id.* at 1294. Plaintiff has not argued that the hearsay declarants would be unavailable at trial or that the alleged hearsay statements could not otherwise be reduced to an admissible form at trial. Consequently, the Court will consider the alleged hearsay statements.

coaching at that time. (Doc. 96-7 at 7-14; Doc. 112-1 at ¶ 16). Taylor testified that she planned to give Plaintiff a coaching about this issue in July of 2018 but "every time we tried to go to the club to see her, she wasn't there." (Doc. 97 at 93:12-95:3).[3] On November 8, 2018, Taylor gave Plaintiff a second written coaching for the June 26, 2018, door-locking incident, which stated that Plaintiff "failed to ensure that the outside and inside entrance door was deadbolted" when exiting the Club. (*Id*; Doc. 96-16).

### 4.     *Plaintiff's Maternity Leave and Return to Work*

Plaintiff was out of the Club on a combination of paid time off and maternity leave from July 12, 2018, through October 7, 2018. (Doc. 111-1 at ¶¶ 37-39). During that time, Marvin Ramsey was the acting manager of the Club. *Id*. at ¶ 42. Plaintiff decided to come back from her maternity leave early on October 9, 2018. (Doc. 95 at 231:5-18). Plaintiff still had unused FMLA leave available to her at that time. (Doc. 111-1 at ¶ 53).[4] Plaintiff requested and was granted all the maternity leave

---

[3] Plaintiff disputes that her supervisors were unable to find her at the Club in order to provide her with a coaching because she met with Stinson and Parker on July 10, 2018, about the unlocked doors, and she was not coached at that time. (Doc. 111-1 at ¶ 32).

[4] The parties dispute whether Plaintiff had eight weeks of unused FMLA available, (Doc. 97-6 at 11), or only two weeks of unused FMLA leave, along with other leave, (Doc. 95 at 232:2-9), but the exact amount of FMLA leave Plaintiff had

she requested (July 30, 2018—October 7, 2018) from Sedgwick, Defendant's third-party leave administrator. *Id.* at ¶ 39. When Plaintiff returned from her maternity leave on October 9, 2018, Plaintiff felt the Club was not in good shape. *Id.* at ¶ 57. Plaintiff complained to Taylor about the condition of the Club and that Ramsey had not done what he needed to do when he was acting manager of the Club, and Plaintiff sent Taylor pictures of the store to support her concerns. (Doc. 111-1 at ¶ 58; Doc. 112-1 at ¶ 20).

### 5.    *Plaintiff's Work Injury*

On October 18, 2018, Plaintiff injured her back at work after bending down to push a pallet of merchandise. (Doc. 111-1 at ¶ 61; Doc. 112-1 at ¶ 25). Hajra Kadric, the Club's general merchandise manager, was with Plaintiff at the time of the injury. (Doc. 111-1 at ¶ 62). Plaintiff completed a written "associate incident report" on October 18, 2018. (Doc. 95-29). It is disputed whether Kadric emailed other managers, including Taylor, about Plaintiff's injury on October 18. (Doc. 112-1 at ¶ 27; see also Doc. 99 at 31:23-33:9).[5] Later in the afternoon on October 18,

---

remaining is not material.

[5]   As discussed below, because the Court grants in part Plaintiff's motion for sanctions based on the spoliation of Kadric's emails, the Court assumes, for purposes of the cross-motions for summary judgment, that the missing emails would have included the email that Kadric allegedly sent to Stinson and Taylor on

2018, Plaintiff texted Taylor to let her know that the pallets in the seasonal section were out for sale and that the associates were working on signage, but Plaintiff did not mention her injury. (Doc. 111-1 at ¶ 63). Plaintiff herself did not notify Taylor or Stinson about her injury on the day that it occurred. *Id*. at ¶ 64. Plaintiff testified that she asked Kadric to "key in" the incident, which is required under Defendant's policy to be done within 24 hours of the injury, but Kadric failed to do so until October 21, 2018. *Id*. at ¶ 65. Plaintiff worked on October 19-20, 2018, without mentioning her injury to Taylor. *Id*. at ¶ 66.

On October 21, 2018, Plaintiff emailed Taylor and Stinson letting them know that she had gone to the emergency room that afternoon due to a work injury from October 18, that the ER doctor excused her from work for the next two days, and stating that "I am not sure who [keys] the incident if we do it at the club level or what the next steps are." *Id*. at ¶¶ 67-68; Doc. 112-1 at ¶ 28; *see also* Doc. 95-31. This was the first time Plaintiff directly informed Taylor or Stinson of her injury. (Doc. 111-1 at ¶ 67). In her response, Taylor instructed Plaintiff to have Kadric key in the incident, and she did not mention any rule violations. (Doc. 95-31). Defendant's policy for work-related injuries states:

---

October 18, 2018, reporting Plaintiff's injury the day that it occurred.

> Associates must report a work related injury or incident immediately to their supervisor or a member of management…
>
> Associate injuries not requiring medical attention are referred to as Associate Incidents. All associate incidents are required to be reported to the Claims Administrator and to be keyed into the Incident Reporting System (IRS) within 24 hours of notice.
>
> Associate injuries requiring medical attention must be reported by a member of management through the … [IRS] within 24 hours from the time the associate requests medical treatment or when a member of management first becomes aware that the associate sought medical treatment.

(Doc. 95-13 at 1-2). Taylor agreed at her deposition that if Plaintiff's work injury was reported to Kadric on October 18, then it was Kadric's responsibility to key the incident into the IRS system. (Doc. 112-1 at ¶ 78). Defendant's policies prohibited Plaintiff from keying her own injury into the IRS system. *Id.* at ¶ 79.

On October 23, 2018, Plaintiff went to the doctor, who diagnosed her with muscle strains and sciatica and told her that she was permitted to return to work that day and to work her entire shift with the following restrictions: lifting up to five pounds constantly, pushing/pulling up to five pounds constantly, no squatting, no kneeling, and no bending. (Doc. 111-1 at ¶ 73; Doc. 104-7 at 2). These restrictions were in effect until Plaintiff's next doctor visit on October 25. (Doc. 104-7 at 2). On October 25, 2018, Plaintiff's doctor told her that she was permitted to return to work with the following restrictions in effect until October 29: no

kneeling or squatting, may not lift more than five pounds for more than eight hours per day, and may push/pull up to fifteen pounds for up to eight hours per day. *Id.* at 1.

On October 28 or 29, 2018, Plaintiff and Taylor had an in-person conversation at the Club, during which Plaintiff broke down and began crying. (Doc. 95 at 133:25-134:13, 185:1-15; Doc. 97 at 151:12-153:24). It is disputed whether Plaintiff began crying about needing to take time off due to pain from her back injury or because she regretted taking the job at the Duluth Sam's Club. *Compare* Doc. 95 at 133:25-134:13, 185:1-15 (Plaintiff's testimony that she broke down due to telling Taylor that she "needed time off or that [Plaintiff] was considering time off" due to her back pain, which was not getting better) *with* Doc. 97 at 151:12-153:24 (Taylor's testimony that Plaintiff did not discuss her back injury or ask to go out on leave but had a breakdown about the Club being "too big of a club for her"). Plaintiff alleges that she did not distinguish between whether she needed FMLA or PTO; she alleges that she just told Taylor that she "was probably going to take some time off" due to her back injury. (Doc. 95 at 268:11-13). Plaintiff testified that she had not made the decision to take leave as of October 28/29. *Id.* at 349:9-13 ("I did not specifically make … the decision. I just made her aware, hey, I am thinking about leave, I am not getting any better.").

On October 29, 2018, Plaintiff had a recheck doctor's appointment at lunch time. (Doc. 111-1 at ¶ 74; Doc. 112-1 at ¶ 34; Doc. 97-17). Following the appointment, Plaintiff texted Taylor:

> Hey Angela- I just finished with the Dr. going home- I am in a[n] incredible amount of pain. …
> My intention was to run to my appt while on lunch but I am in so much pain and discomfort that I couldn't go back. The dr referred me to a specialist and ordered an MRI. My restrictions still remain the same. I will probably be back tomorrow unless I feel like today.

(Doc. 97-15). On November 6, 2018, Plaintiff texted Taylor and said, "I had physical therapy yesterday and I am in a lot of pain this morning … [I] don't think that I will make it [to work] today." (Doc. 112-1 at ¶ 36). Taylor then sent a text message to Stinson stating that Plaintiff "is constantly saying she is in pain and not working. How should we proceed with her? I am going to have James enter the 3rd level coaching into the system. I really believe she is dodging me so I cannot administer the coaching." (Doc. 97-20 at 1). Later that day, Stinson responded to Taylor that "she is going to cause us major los[s]." *Id*. at 2. Taylor testified that this text from Stinson was "telling [Taylor] that the accident cost [related to Plaintiff's workplace injury] is going to be great." (Doc. 97 at 171:14-172:10). On November 7, 2018, Plaintiff visited her orthopedist and was not at work. (Doc. 112-1 at ¶ 40).

13

### 6.   Preparations for the November 2018 One-Day Sale

On November 8, 2018, Plaintiff, Taylor, and Kadric met at the Club to conduct a walk-through of the Club's preparation for the upcoming one-day sales event on November 10. (Doc. 112-1 at ¶ 41). It is disputed whether Taylor commented that the Club looked good on this walk-through. (*Compare* Doc. 99 at 54:16-25 (Kadric's testimony that Taylor commented that the store looked amazing on the walk-through)[6] *and* Doc. 95 at 367:24-368:1 (Plaintiff's testimony that Taylor said the Club looked good on the walk-through) *with* Doc. 97 at 180:9-22 (Taylor's testimony denying that she commented that the store was in good shape)). It is also disputed whether Taylor viewed the plans for the one-day sale in the event binder. (*Compare* Doc. 99 at 53:1-54:15 (Kadric's testimony that Taylor flipped through the binder, had no complaints, and said, "Looks like you guys got it") *and* Doc. 95 at 377:20-25 (Plaintiff's testimony that Taylor looked over the binder and the plans for the one-day sale) *with* Doc. 97 at 184:1-185:22 (Taylor's testimony denying that she looked through the binder and instead that Plaintiff and Kadric discussed their plans with her)).

---

[6] The page numbers of Kadric's deposition do not line up with the blue CM/ECF header page numbers. (*See* Doc. 99). The Court cites to the CM/ECF page numbers.

Kadric testified that Plaintiff was having a hard time walking and was sweating during the November 8 walk-through with Taylor. (Doc. 99 at 49:16-20). Taylor testified that she did not notice Plaintiff sweating or in visible pain during the walk-through. (Doc. 97 at 180:23-181:6). It is disputed whether Taylor told Plaintiff "no" when Plaintiff asked for a break during the walk-through. (*Compare* Doc. 95 at 180:9-12, 271:9-17, 272:8-13 (Plaintiff's testimony that she asked Taylor for a break, Taylor told her that they were almost done, and 30-40 minutes later Plaintiff told Taylor that she needed to use her breast pump and was able to take a break) *and* Doc. 99 at 48:16-50:1 (Kadric's testimony that Plaintiff asked for a break, Taylor responded "not now," and Plaintiff asked for a break again and got one) *with* Doc. 97 at 181:4-7 (Taylor's testimony that Plaintiff requested a break, and Taylor said okay and continued the walk-through with Kadric)).

Taylor provided Plaintiff with a break on November 8, but Plaintiff felt that she was not accommodated because she did not get the break until 30-40 minutes after she requested it. (Doc. 111-1 at ¶ 80). When Plaintiff asked Taylor for a break on November 8, Plaintiff was not under any medical restriction limiting her ability to walk. *Id*. at ¶ 81. Plaintiff testified that she told Taylor that she did not appreciate Taylor not giving her the requested break and that Plaintiff strongly thought that she would be taking her "baby bonding" leave just to get better. (Doc. 95 at 191:6-

15

24). On November 8, 2018, Plaintiff received the second written coaching from Taylor (with Stinson as a witness via telephone) for the June 26, 2018, door-locking incident, which stated that Plaintiff "failed to ensure that the outside and inside entrance door was deadbolted" when exiting the Club. (Doc. 96-16; Doc. 112-1 at ¶ 72).

Later in the day on November 8, Plaintiff went to physical therapy, the orthopedist, and ultimately the ER. (Doc. 112-1 at ¶ 46). Plaintiff's orthopedist allowed her to return to work with the following restrictions in effect until November 21, 2018: no lifting more than 20 pounds, no pushing or pulling more than 20 pounds, no excessive bending at the waist, no prolonged walking or standing more than 45 minutes per hour, and no ladder or repetitive stair climbing. (Doc. 104-7 at 11). Plaintiff told Taylor about her ER visit. (Doc. 112-1 at ¶ 47). Plaintiff's doctor's note from the ER visit stated that she could return to work on November 10, 2018, with no restrictions. (Doc. 96-19; Doc. 104-7 at 23). It is disputed whether Plaintiff had a discussion with her workers' compensation adjuster, Chris Caudill, on November 8, 2018, about her need to take leave. (*Compare* Doc. 95 at 135:12-24 (Plaintiff's testimony that she called Caudill and told him that she was "probably going to take [her] baby bonding time just so [she] can recover" because she was having a hard time with Taylor following Plaintiff's job

16

restrictions) *with* Doc. 103 at 58:19-59:22 (Caudill's testimony that he did not remember having that conversation with Plaintiff)).

On the morning of November 9, 2018, Plaintiff texted Taylor and told her, "I am still in pain uncomfortable. I will probably be there tonight for final event set up." (Doc. 111-1 at ¶ 85). Taylor went to the Club on November 9 because Plaintiff was going to be out that day. (Doc. 97 at 192: 4-7). It is disputed whether the Club was prepared for the one-day sale when Taylor arrived on November 9. (*Compare* Doc. 97 at 159:21-160:2, 189:16-190:25 (Taylor's testimony that none of the merchandise for the one-day sale was out and none of the associates knew what the plans were to prepare for the one-day sale) *with* Doc. 94 at 53:11-25 (Sherry Melson, a manager at the Club, testified that when she left the Club at 7:00 am on November 9, the Club was as ready as it was supposed to be and "everything was done")).[7] Taylor testified that the plans and binder for the one-day sale could not be located and the associates did not know who was doing what. (Doc. 97 at

---

[7] The page numbers of Melson's deposition do not line up with the blue CM/ECF header page numbers. (*See* Doc. 94). The Court cites to the CM/ECF page numbers.

189:16-23). Melson testified that she looked through one-day sale plans in the binder on the night of November 9. (Doc. 94 at 56:4-57:24).[8]

Plaintiff texted Taylor at 10:59 a.m. on November 9, 2018, and stated, "I'll try to come in tonight and do the final plans and review schedules for tomorrow once again." (Doc. 111-1 at ¶ 91). Taylor responded, "This is why you cannot wait until the last minute to set." *Id.* at ¶ 92. When texting Plaintiff on November 9,

---

[8] Kadric also testified that she saw the binder on November 9, 2018. (Doc. 99 at 60:19-61:21). However, Kadric sent a text message to Taylor on November 10, 2018, that stated, "I wanted to let you know that I spoke to [Plaintiff] about being absent due to having bronchitis and a high fever. I didn't want it to look like I didn't show up to work yesterday and today for no reason." (Doc. 100-2 at 1). During her second deposition, Kadric testified that she did not remember if she was at work on November 9, 2018, but she "could have been there for a few hours." (Doc. 100 at 14:18-25, 16:8-16). Defendant asserts that Kadric's testimony as to the binder is not credible or competent. (Doc. 107-2 at 20 n.4). The Eleventh Circuit has held that:

> [v]ariations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.

*Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986). Viewing Kadric's testimony in the light most favorable to Defendant, a juror could question Kadric's credibility and find that Kadric's testimony fails to support Plaintiff's account of events. *See Kingsley v. Tellworks Commc'ns, LLC*, No. 1:15-CV-4419-TWT-JSA, 2017 WL 2624555, at *29 n.21 (N.D. Ga. May 24, 2017), *adopted by* 2017 WL 2619226 (N.D. Ga. June 15, 2017).

Taylor did not mention that the plans for the one-day sale in the binder were missing. (Doc. 118 at ¶ 28). Taylor called three club managers in from other clubs to help set up the Club for the one-day sale. (Doc. 111-1 at ¶ 93).[9]

### 7.    Plaintiff's Third Written Coaching and Termination

Taylor called Alejandro Munoz at 12:55 p.m. on November 9 to let him know that Taylor planned to terminate Plaintiff, and Munoz approved the termination. (Doc. 97 at 251:4-25). Plaintiff texted Taylor on November 9 at 3:48 p.m. and asked if Taylor would be "opposed if I took a week of PTO to see if that's going to help me get back to normal? I understand the timing but the pain is horrible and I can't keep calling out, I already missed 2 days." (Doc. 96-21 at 49). In response, Taylor suggested that she and Plaintiff meet on the following Monday to discuss the PTO request. (Doc. 111-1 at ¶ 97). Plaintiff then asked if Taylor was denying her PTO request, and Taylor said they needed to clarify the schedule before Taylor could approve PTO. *Id*. at ¶¶ 98-99. Taylor had already decided to and received approval to terminate Plaintiff's employment before Plaintiff requested PTO on November 9. *Id*. at ¶ 100. Plaintiff also submitted a request to Sedgwick for six weeks of baby

---

[9] Plaintiff disputes that it was necessary to call in three other managers to help set up the Club, but she does not dispute that Taylor did so. (Doc. 111-1 at ¶ 93).

bonding leave on the afternoon of November 9. (Doc. 112-1 at ¶ 52). Sedgwick is Defendant's third-party leave administrator that conveys decisions regarding whether to grant an employee leave. (Doc. 111-1 at ¶ 109). Taylor was not aware of Plaintiff's November 9 request to take baby bonding leave. *Id.* at ¶ 105.

Later in the evening on November 9, 2018, Plaintiff came to the Club. (Doc. 111-1 at ¶ 101). At that time, Taylor gave Plaintiff a third written coaching for not reporting her October 18 work injury to her leadership until October 21 and not having her incident keyed into the system within 24 hours. (Doc. 96-24; Doc. 97 at 118:15-25; Doc. 112-1 at ¶ 74). Taylor also informed Plaintiff on November 9, 2018, that she was being terminated for "Inability to Perform Job" due to her failing to ensure that the Club was prepared for the one-day sale. (Doc. 111-1 at ¶ 104). Taylor did not interview Kadric, Plaintiff, or Melson before deciding to terminate Plaintiff. (Doc. 112-1 at ¶ 96).

### 8.     *EEOC Charge and FMLA Policy*

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on November 15, 2018. (Doc. 95-24). The charge alleged retaliation and discrimination based on disability and stated that the discrimination took place between October 18, 2018, and November 9, 2018. *Id.* Plaintiff stated in the charge that "[o]n October 18, 2018, I was injured on the job.

On November 9, I asked my supervisor, Angela Taylor, for time off to recover from my injuries, and I was discharged." *Id.* The first and only time that Plaintiff complained to Defendant about disability discrimination was after her termination. (Doc. 111-1 at ¶ 111). Taylor was aware that Plaintiff went to the doctor "quite a bit." (Doc. 112-1 at ¶ 56). Plaintiff told Taylor that she had problems walking and that her back hurt whether she walked or sat. *Id.* at ¶ 57. With regard to her back injury, Plaintiff testified that she was "in severe pain" and that she "had issues but [she] still was able to perform [her] job." (Doc. 95 at 216:24, 217:12-13). She stated that:

> I had issues with sleeping, I had [issues] with my everyday life at home, but I was still performing my job. … I was still able to perform my job and the only issues I had, I had a lot of issues sleeping, I had a lot of issues doing my daily tasks at home and it was getting progressively worse and I wasn't getting better[.]

*Id.* at 217:21-218:1, 218:15-20.

Taylor did not mention FMLA leave to Plaintiff at any time before her termination, and Taylor testified that there was no reason for her to have done so because Plaintiff "had the ability to apply for leave any time she chose to." (Doc. 97 at 154:7-16). Defendant's policy on FMLA leave states that Defendant "has transitioned the administration of leave of absence requests to another company, Sedgwick" and directs employees that "[w]hen you become aware of an

associate's need or request to take FMLA leave, direct the associate to contact

Sedgwick." (Doc. 97-3 at 1-2). The policy later states, "you must recognize when

an associate's request for time off is for an FMLA-qualifying circumstance and

direct them to contact Sedgwick." *Id*. at 3.

## II.   MOTION FOR SANCTIONS

### A.   *Background*

Before addressing the merits of the motions for summary judgment, the

Court will first consider Plaintiff's motion for sanctions, (Doc. 67). In her motion,

Plaintiff argues that Defendant failed to preserve two[10]  categories of information:

(1) electronically stored event plans for the November 2018 "one-day sale" and (2)

the email accounts of Plaintiff (or at least part of Plaintiff's emails), Hajra Kadric,

and Chaneta Montoban. *Id*. at 2, 7-11. Plaintiff argues that Defendant had a duty

to preserve immediately after Plaintiff's termination on November 9, 2018, because

Plaintiff sent internal complaints to Defendant alleging wrongful termination

---

[10] In her motion for sanctions, Plaintiff also addressed a third category of information that she alleged Defendant failed to preserve—reports of employee injuries that were keyed into Defendant's reporting system more than 24 hours after the injury occurred. (Doc. 67 at 2-3). However, in her reply brief, Plaintiff withdraws the portion of her spoliation motion relating to this category of evidence. (Doc. 86 at 14).

within hours of being terminated, because Defendant learned that Plaintiff had retained an attorney on November 12, 2018, and because Defendant's Human Resources associates sent emails on November 13 and 16, 2018, recognizing that they were "going to need" documentation related to Plaintiff's termination. *Id*. at 5-6. Plaintiff also notes that Defendant withheld certain November 12, 2018, emails in this litigation as work product, with the representation that Defendant anticipated litigation as of that date. *Id*. at 6. Plaintiff alleges that Defendant was on notice of Kadric's and Montoban's relevance because Defendant's own internal investigation documents identified them as witnesses. *Id*. at 10. Plaintiff argues that the spoliated evidence is probative of whether Plaintiff actually committed the rule violations that Defendant held her accountable for and that there is no equivalent substitute for these documents. *Id*. at 13. Plaintiff argues that this Court can find Defendant acted in bad faith because Defendant's actions caused the spoliation, Defendant fully appreciated the significance of the evidence to the anticipated litigation, and Defendant has a "track record" of being sanctioned for spoliation by other courts. *Id*. at 14-16. Plaintiff asks this Court to find, for purposes of trial and summary judgment, that the electronically stored event plans and the emails contained evidence adverse to Defendant and to grant attorneys' fees for this motion and Plaintiff's efforts to obtain the destroyed items. *Id*. at 16.

In response, Defendant first argues that Plaintiff's motion should be denied and that expenses in opposing the motion should be awarded to Defendant under Federal Rule of Civil Procedure 37(a)(5)(B) because Plaintiff's counsel made no effort to meet and confer with Defendant's counsel prior to bringing the motion. (Doc. 81 at 1, 5). Defendant also argues that Plaintiff failed to comply with the requirement in this Court's scheduling order that the parties meet and confer prior to the filing of any non-dispositive motion or discovery dispute, and the motion should be denied on this basis. *Id*. at 2, 5-6. Defendant contends that the electronic plans for the one-day sale consist only of "Generic Event Plans," not the store-specific plans that Plaintiff was terminated in part for failing to create, and thus are not at issue in this case and do not assist Plaintiff with respect to her claims. *Id*. at 7-12. Defendant alleges that it had no duty to preserve the generic plans, which are not accessible after the event passes, because it was not on notice that Plaintiff might claim that the generic plans were relevant to her potential litigation. *Id*. at 12-15.

Defendant further argues that Plaintiff never identified Montoban as an electronically stored information (ESI) custodian and never requested that Defendant produce any of Montoban's emails. (Doc. 81 at 15). As to Kadric, Defendant contends that her email account was purged in the normal course of

business following her resignation on November 10, 2018, and that Defendant was not on notice that Kadric's emails might be relevant in future litigation. *Id.* at 16. Defendant argues that, despite a legal hold placed on Plaintiff's two email accounts, it has been able to retrieve only some, but not all, of Plaintiff's emails. *Id.* at 17. However, Defendant contends that it has produced any and all responsive emails that Plaintiff or Kadric sent to, or received from, the other eight ESI custodians that Plaintiff named and that therefore Plaintiff has not shown that Defendant failed to produce any relevant email. *Id.* at 17-18. Defendant argues that the only specific email Plaintiff contends was destroyed (an alleged email from Kadric to management, notifying them on October 18, 2018, of Plaintiff's injury) never actually existed because the email was not produced from the email accounts of the two employees to whom it was allegedly sent. *Id.* at 18. Defendant alleges that none of the evidence sought is crucial to Plaintiff's case, Plaintiff is not prejudiced by the absence of the evidence, and Plaintiff has not shown that Defendant acted in bad faith. *Id.* at 21-22.

In reply, Plaintiff argues that Defendant's "selective preservation" of documents helpful to the defense—while failing to preserve Plaintiff's email account, Kadric's email account, and the generic one-day sale plans—shows its intent to deprive. (Doc. 86 at 3). Plaintiff argues that Kadric testified that she sent

an email to managers notifying them of Plaintiff's work injury on the day that it occurred and that this email alone would show pretext as to Defendant's decision to discipline Plaintiff for failing to report the injury within 24 hours. *Id*. at 3-4.[11] She contends that Kadric was a key player in the anticipated litigation and Defendant knew of its duty to preserve her email. *Id*. at 7-9. Plaintiff also argues that Defendant's failure to preserve the corporate issued generic timeline of when event items should be placed on the sales floor for the one-day sale prejudices her ability to demonstrate pretext by showing that she prepared the store in compliance with the company timeline. *Id*. at 4, 12-13. Plaintiff also argues that she did confer with Defendant about the "above topics on no less than eight (8) occasions over three (3) months before filing the present motion" and that Defendant's request for attorneys' fees under Rule 37(a)(5)(B) is meritless. *Id*. at 14-15.

---

[11] Plaintiff also argues, for the first time in her reply brief, that she was prejudiced by the failure to preserve her and Kadric's email accounts because the accounts may have contained emails between the two about their preparation for the one-day sale in November of 2018. (Doc. 86 at 4, 9). The Court does not consider this argument because it was brought for the first time in Plaintiff's reply brief. *See Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1301 (N.D. Ga. 2014) ("As a general rule, federal courts do not consider arguments that are presented for the first time in a reply brief.").

### B.      Standard

Federal Rule of Civil Procedure 37(e) provides, in relevant part, that:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1)   upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2)   only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A)   presume that the lost information was unfavorable to the party;

(B)   instruct the jury that it may or must presume the information was unfavorable to the party; or

(C)   dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

"Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process." *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999). And a district court has substantial discretion in deciding whether to impose sanctions under Rule 37. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997); *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993).

Plaintiff has moved for sanctions against Defendant for alleged spoliation of evidence. "'Spoliation is the destruction or significant alteration of evidence, or

27

the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). As the party seeking sanctions against Defendant for the alleged spoliation of evidence, Plaintiff must prove that: "(1) the missing evidence existed at one time; (2) Defendant had a duty to preserve the evidence; and (3) the evidence was crucial to Plaintiff's being able to prove" her case. *Deeb v. SMC Mktg. Corp.*, No. 1:16-CV-2468-RWS, 2018 WL 6177958, at *2 (N.D. Ga. Aug. 6, 2018) (internal quotation marks and alteration omitted) (quoting *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011)).

Even if Plaintiff can establish all three of these elements, "a party's failure to preserve evidence rises to the level of sanctionable spoliation only when the absence of that evidence is predicated on bad faith, such as where a party purposely loses or destroys relevant evidence." *In re Delta/AirTran*, 770 F. Supp. 2d at 1305 (internal quotation marks omitted). Once a court makes the finding that a party has engaged in the spoliation of evidence, the Eleventh Circuit has held that the court should then consider five factors in determining what sanctions, if any, are appropriate: "(1) prejudice to the non-spoiling party as a result of the destruction of evidence, (2) whether the prejudice can be cured, (3) practical

28

importance of the evidence, (4) whether the spoiling party acted in good or bad faith, and (5) the potential for abuse of expert testimony about evidence not excluded." *Id.* (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005)).

### C.   Analysis

As an initial matter, the Court disagrees with Defendant's assertion that Federal Rule of Civil Procedure 37(a)(5)(B) governs the instant motion for sanctions. (*See* Doc. 81 at 1, 5). Rule 37(a) applies to motions for an order compelling disclosure or discovery and requires that such motions "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). Rule 37(a)(5)(B) is inapplicable here because Plaintiff has not brought a motion to compel, but rather brings a motion for sanctions for alleged spoliation. *See, e.g.*, *Wal-Mart Stores, Inc. v. Cuker Interactive, LLC*, No. 5:14-CV-5262, 2017 WL 239341, at *2 (W.D. Ark. Jan. 19, 2017) ("Rule 37(a)(5)(B) pertains to denials of motions to compel disclosure or discovery—not…to denials of motions seeking sanctions for spoliation of evidence.").

Also, the Court notes that Defendant is correct that the scheduling order in this case states that "[p]rior to filing any non-dispositive motion, a party must contact the non-moving party…to determine whether any party opposes the motion." (Doc. 16 at 4). Plaintiff did not do so here.[12]  The Court declines to deny Plaintiff's motion for sanctions or award attorneys' fees on this basis alone, as the Court does not agree with Defendant's assertion that Plaintiff's motion "lacks any factual or legal basis." (Doc. 81 at 1). However, Plaintiff is directed in the future to follow the Court's scheduling order and fulfill her obligation to confer with the non-moving party and include a statement of whether the non-moving party opposes the motion. Had Plaintiff done so, she could have avoided addressing the third category of information related to employee injury reports (and then withdrawing that portion of her motion when Defendant produced responsive documents). (*See* Doc. 67 at 2-3; Doc. 86 at 14). The Court next considers the two remaining categories of evidence in turn.

---

[12]  Plaintiff claims in her reply brief that she "previously filed an email that shows much of the conferral as well as Walmart's position on the present motion for sanctions." (Doc. 86 at 15). The Court disagrees. The email chain cited by Plaintiff includes discussion on certain of the discovery issues included in Plaintiff's motion for sanctions, but nowhere in that email chain is a discussion that Plaintiff planned to bring a motion for sanctions based on spoliation or Defendant's position on such a motion. (*See* Doc. 67-14).

### 1. *Generic Plans for the November 2018 One-Day Sale*

With respect to Plaintiff's claim regarding Defendant's failure to retain the generic electronic plans for the November 2018 one-day sale, the Court finds that Plaintiff has failed to establish that sanctions are warranted for the alleged spoliation. Plaintiff first must prove that: "(1) the missing evidence existed at one time; (2) Defendant had a duty to preserve the evidence; and (3) the evidence was crucial to Plaintiff's being able to prove" her case. *Deeb,* 2018 WL 6177958 at *2 (internal quotation marks and alteration omitted). Plaintiff clearly establishes the first element, but she has not shown that Defendant had a duty to preserve the generic plans or that the evidence at issue is "crucial" to proving her case.

Defendant does not dispute that the generic plans for the November 2018 one-day sale existed at one time. (Doc. 81 at 12 ("The Generic Plans were housed temporarily and electronically on the WIRE, Walmart's Intranet, along with other Company information such as policies, and procedures, etc.")). However, Defendant alleges that Plaintiff was terminated, in part, because her store was not properly prepared for the one-day sale, as Plaintiff had either not created *club-specific* plans for the sale or did not communicate those club-specific plans to the store's employees. *Id.* at 12-13. Thus, Defendant argues that it had no duty to preserve the generic plans, which did not include the club-specific plans for

31

Plaintiff's store, because the generic plans had no bearing on why Plaintiff's employment was terminated and because Defendant was not on notice that Plaintiff might later claim that the generic plans would be relevant to potential litigation. *Id.* at 7-15. Plaintiff alleges that Defendant had notice of impending litigation within hours of her termination when she sent two internal "open-door" complaints that same day alleging that Defendant wrongfully terminated her employment. (Doc. 86 at 2).

"[A] party's obligation to retain documents…is only triggered when litigation is reasonably anticipated. Thus, if [the defendant] owed any document preservation duty to [the plaintiffs], it arose only when [the defendant] could have 'reasonably foreseen' civil litigation." *In re Delta/AirTran*, 770 F. Supp. 2d at 1307 (internal citation omitted). However, "it is well-settled that a corporation under a duty to preserve is not required to keep every shred of paper, every e-mail or electronic document, and every backup tape. In essence, the duty to preserve evidence…applies to unique, relevant evidence that might be useful to the adversary." *Marshall v. Dentfirst, P.C.*, 313 F.R.D. 691, 697 (N.D. Ga. 2016) (internal omission and quotation marks omitted). Plaintiff does not show why Defendant should have been on notice that the generic plans for the one-day sale would be at issue in potential litigation, where Defendant had allegedly terminated Plaintiff,

in part, for failing to have a binder of *club-specific* plans or failing to communicate *club-specific* plans to employees.

Even assuming that Defendant did have a duty to preserve the generic plans for the one-day sale, Plaintiff fails to show that "the evidence was crucial to Plaintiff's being able to prove" her case. *Deeb,* 2018 WL 6177958, at *2 (internal quotation marks omitted). Plaintiff contends that she has been prejudiced because the electronic generic plans for the one-day sale would enable her to show pretext. (Doc. 86 at 12-13 ("Walmart's verified interrogatories state that it terminated Plaintiff (in part) because Plaintiff's club was 'not prepared' since certain items were not on the sales floor on Friday morning. (Doc. 67-13, p. 20). Plaintiff contends that this is false and that these items were not required to be on the floor Friday morning.")). The Court disagrees. In the interrogatory response cited by Plaintiff in support of her claim that the generic plans would aid her in showing pretext, Defendant asserts that Plaintiff's store "was not ready at all" the day before the one-day sale and that employees at Plaintiff's store did not know the club-specific plans and did not know where to find Plaintiff's binder with the club-specific plans. (Doc. 67-13 at 20-21). Contrary to Plaintiff's assertions, Defendant does not refer to specific items that it alleges Plaintiff should have already had on the sales floor on the morning before the one-day sale. *See id*; *see also Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (holding that, to show pretext, a plaintiff must show inconsistencies "in the employer's proffered legitimate reasons for its action" (internal quotation marks omitted)).

Accordingly, the generic plans, even if they stated that certain items were not required to be placed on the sales floor the morning before the one-day sale, would not establish or even aid in showing pretext as to Defendant's actual proffered reasons for Plaintiff's termination relating to the one-day sale: that Plaintiff's binder with *club-specific* plans for the one-day sale could not be found and that the employees at Plaintiff's store did not know the *club-specific* plans for the one-day sale on the day before the sale. The generic plans are not "crucial" evidence justifying sanctions for spoliation. *See, e.g., In re Delta/AirTran*, 770 F. Supp. 2d at 1310 ("Where, as here, the moving party is not able to establish that the allegedly destroyed evidence is critical to the case, courts have consistently refused to impose spoliation sanctions.").

## 2.   *Employee Email Accounts*

The Court will next consider Plaintiff's claims that Defendant failed to preserve the email accounts of Chaneta Montoban, Plaintiff, and Hajra Kadric.

34

### a. *Chaneta Montoban*

Plaintiff has failed to establish that sanctions are warranted for the alleged spoliation of Chaneta Montoban's email account. Again, Plaintiff must prove that: "(1) the missing evidence existed at one time; (2) Defendant had a duty to preserve the evidence; and (3) the evidence was crucial to Plaintiff's being able to prove" her case. *Deeb,* 2018 WL 6177958, at *2 (internal quotation marks and alteration omitted). Here, Plaintiff makes no argument whatsoever as to the third element—that Montoban's emails are crucial to her ability to prove her case. Nor does she even assert that Montoban's emails are relevant to her case. Plaintiff asserts only that Defendant identified Montoban as a witness with relevant knowledge yet chose not to preserve her emails. (Doc. 86 at 9 n.9). She argues that the Court should prohibit Defendant from calling Montoban as a witness or introducing any documents relating to her "[t]o cure the prejudice to Plaintiff." *Id.*

However, Defendant asserts, and Plaintiff does not deny, that Plaintiff never identified Montoban as an ESI custodian or requested that Defendant produce any email from Montoban's email account. (Doc. 81 at 15; *see generally* Doc. 86). Plaintiff does not describe any alleged prejudice resulting from Defendant's failure to preserve Montoban's emails. Accordingly, the Court declines to prohibit Defendant from calling Montoban as a witness or introducing documents related

35

to her. *See In re Delta/AirTran*, 770 F. Supp. 2d at 1310 ("[T]o justify the imposition of spoliation sanctions, courts within this circuit have recognized the importance of the movant proving that 'critical' or 'crucial' evidence was destroyed.").

### b. *Plaintiff*

Plaintiff has also failed to establish that sanctions are warranted for the alleged spoliation of some of her own emails. Plaintiff asserts that Defendant admitted that "only some" of her emails were preserved. (Doc. 67 at 9). Defendant acknowledges that Plaintiff had two work email addresses that were linked together, and that Defendant has only been able to retrieve some but not all of the emails from Plaintiff's linked email accounts. (Doc. 81 at 17 n.3; *see also* Doc. 81-9 at ¶¶ 7-8). Plaintiff does not specify what prejudice she suffers due to Defendant's failure to preserve all of her emails or argue that any of Plaintiff's unpreserved emails are crucial to her ability to prove her case. (*See generally* Docs. 67, 86).[13]  As with the discussion of Montoban's emails, Plaintiff fails to show that she suffered

---

[13]  As noted above, Plaintiff argues for the first time in her reply brief that she was prejudiced by the failure to preserve her and Kadric's email accounts because they may have contained emails between the two about their preparation for the one-day sale in November of 2018. (Doc. 86 at 4, 9). The Court does not consider this argument because it was brought for the first time in Plaintiff's reply brief. *See Rindfleisch*, 22 F. Supp. 3d at 1301 ("As a general rule, federal courts do not consider arguments that are presented for the first time in a reply brief.").

prejudice sufficient to support the sanction she seeks. *See In re Delta/AirTran*, 770 F. Supp. 2d at 1310 (requiring the movant to prove that "'critical' or 'crucial' evidence was destroyed" to justify sanctions for spoliation).

### c. Hajra Kadric

The Court next considers whether sanctions are warranted for the alleged spoliation of Hajra Kadric's email account. Plaintiff must prove that: "(1) the missing evidence existed at one time; (2) Defendant had a duty to preserve the evidence; and (3) the evidence was crucial to Plaintiff's being able to prove" her case. *Deeb,* 2018 WL 6177958, at *2 (internal quotation marks and alteration omitted). The Court finds that she has done so.

Neither party disputes the first element, that the missing evidence existed at one time. As to the second element, Plaintiff argues that Defendant was on notice of Kadric's relevance and had a duty to preserve her email in the days immediately following Plaintiff's termination because Defendant's own investigation documents identify Kadric as a witness and Plaintiff's open-door complaint following her termination stated that Kadric had relevant knowledge. (Doc. 67 at 10; *see also* Doc. 67-1 at 2 (Plaintiff's November 10, 2018, open-door complaint that identified Kadric as a witness to conversations that Plaintiff had with her supervisor, Angela Taylor); Doc. 67-15 at 2 (Defendant's internal

investigation form, dated November 14, 2018, which lists Kadric as a witness)). Defendant asserts that Kadric's email account "was purged in the normal course of business following her resignation on November 10, 2018." (Doc. 81 at 16). Defendant argues that neither the open-door complaint nor the internal investigation document triggered a duty to preserve Kadric's emails, as both documents only referenced that Kadric overheard relevant conversations, not that her *emails* could be relevant in potential litigation. *Id.*

"[A] party's obligation to retain documents, including e-mails, is only triggered when litigation is reasonably anticipated." *In re Delta/AirTran*, 770 F. Supp. 2d at 1307. Here, Defendant does not seem to dispute that litigation was reasonably anticipated in November of 2018. Rather, Defendant's arguments about the duty to preserve focus on whether it had an obligation specifically to preserve Kadric's emails. (*See* Doc. 81 at 16). This is an argument about relevance, because the duty to preserve evidence requires a party, once it reasonably anticipates litigation, "to suspend its routine document retention or destruction policies and institute a litigation hold to ensure the party properly preserves **relevant documents**." *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, No. 3:16-md-2734, 2018 WL 4856767, at *2 (N.D. Fla. Oct. 5, 2018) (emphasis added and internal quotation marks omitted); *see also Marshall*, 313 F.R.D. at 697 ("In essence, the duty

to preserve evidence extends to those employees likely to have relevant information—the key players in the case, and applies to unique, relevant evidence that might be useful to the adversary." (internal quotation marks omitted)); *Compass Chem. Int'l, LLC v. True N. Prods., LLC*, No. 1:09-CV-3491-RLV-WEJ, 2011 WL 13213914, at *24 (N.D. Ga. Feb. 15, 2011) (finding that the duty to preserve applied where "[a] reasonable person…should have known…that the laptop's hard drive could be relevant to future litigation"), *adopted by* 2011 WL 13213870 (N.D. Ga. Mar. 21, 2011).

Defendant argues that the open-door complaint and the internal investigation document did not trigger a duty to preserve Kadric's emails, as both documents only referenced that Kadric overheard conversations, not that her emails could be relevant in potential litigation. (Doc. 81 at 16). The Court finds this argument unconvincing. It is clear that Defendant knew that Kadric was a witness with knowledge as to Plaintiff's alleged grievances—Defendant itself listed Kadric as a witness on its own internal investigation records. (Doc. 67-15 at 2). Defendant's argument parsing Kadric's relevance as a witness from any supposed relevance of her emails attempts to draw too fine of a distinction. A reasonable person should have known that if Kadric was a key witness, then her emails could also be relevant to future litigation.

The Court further finds that Plaintiff has shown that "the evidence was crucial to Plaintiff's being able to prove" her case. *Deeb,* 2018 WL 6177958, at *2 (internal quotation marks omitted). Plaintiff asserts that the failure to preserve Kadric's emails destroyed one critical email in particular—the email that Kadric testified that she sent to Stinson and Taylor on the date of Plaintiff's work-related injury, notifying them of the incident. (Doc. 67 at 11). "Kadric's October 18 notification to the market-level managers, contradicts Taylor's testimony that [she] did not learn of Plaintiff's injury until October 21 and demonstrates pretext." *Id.* The Court agrees. Without the alleged email, there is a question of fact regarding whether Plaintiff (through Kadric's alleged email to Stinson and Taylor) informed upper management of her injury on the day that it occurred, and the resolution of that question of fact depends upon a credibility determination. Accordingly, the Court finds that Plaintiff has met its burden in showing spoliation. *See Deeb,* 2018 WL 6177958, at *2.

The Eleventh Circuit has held that:

[w]hen deciding whether to impose sanctions, a number of factors are relevant: "(1) whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured, (2) the practical importance of the evidence, (3) whether the spoliating party acted in bad faith, and (4) the potential for abuse if sanctions are not imposed."

*Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (quoting *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018)). If ESI has not been preserved:

> a court may cure any prejudice and, upon finding that the spoliating party acted with bad faith, (1) presume the lost evidence was unfavorable to the spoliating party, (2) instruct the jury that it may or must presume the evidence was unfavorable to the spoliating party, or (3) dismiss the action or enter a default judgment.

*Tien v. Red Coats, Inc.*, 753 F. App'x 768, 770 (11th Cir. 2018) (citing Fed. R. Civ. P 37(e)).

With respect to the first *Tesoriero* factor, as noted above, the Court concludes that Plaintiff has been prejudiced by Defendant's failure to preserve Kadric's emails. Kadric has testified that she emailed Stinson and Taylor on the date of Plaintiff's work-related injury, notifying them of the incident. (Doc. 67 at 11). "Kadric's October 18 notification to the market-level managers, contradicts Taylor's testimony that [she] did not learn of Plaintiff's injury until October 21 and demonstrates pretext." *Id.*; *see Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360, 1376 (N.D. Ga. 2008) ("If relevant evidence is not produced, for whatever reason, and then is destroyed…then the absence of the relevant evidence prejudices the party that would have relied on it to prove its case."). Further, the Court finds that this

41

prejudice cannot be cured, as Kadric's emails have been deleted.[14] As to the second factor, the practical importance of the evidence, the alleged email from Kadric goes directly to Defendant's reasons for disciplining Plaintiff and ultimately terminating her employment.

With respect to the third *Tesoriero* factor, the Court concludes that Plaintiff has presented sufficient evidence to create a jury question on whether Defendant acted in bad faith. "Spoliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence. Indeed, 'an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith.'" *Tesoriero*, 965 F.3d at 1184 (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)). "And bad faith in the context of spoliation, generally means destruction for the purpose of hiding

---

[14] The Court is unconvinced by Defendant's argument that its failure to preserve any of Kadric's emails is not prejudicial because, if Kadric had sent the alleged email to Stinson and Taylor, "then that email would have been identified using the ESI search terms Plaintiff provided to Defendant, and subsequently produced from the email account of Mr. Stinson or Ms. Taylor." (Doc. 81 at 18). As discussed further below, Plaintiff has introduced evidence that another manager witnessed Stinson and Taylor attempting to gain access to Plaintiff's email account on the night that she was terminated. (*See* Doc. 67-9 at p. 8-10, 80:19-82:12 (Sherry Melson deposition)). This raises a question of whether Stinson and Taylor deleted any relevant emails. Defendant does not respond to this evidence. (*See generally* Doc. 81).

adverse evidence." *Id.* (internal quotation marks omitted). The court in *Tesoriero*

then discussed cases that illustrate the difference between bad faith and mere

negligence, stating:

> In *Bashir v. Amtrak*, we held on summary judgment that the
> unexplained absence of a train's speed record tape did not warrant an
> adverse inference that the train was traveling at an excessive speed
> when it struck and killed a pedestrian. We would "not infer that the
> missing speed tape contained evidence unfavorable to appellees
> unless the circumstances surrounding the tape's absence indicate bad
> faith, e.g., that appellees tampered with the evidence."

965 F.3d at 1184 (internal citations omitted); *see also Dombrowski v. Lumpkin Cnty.*,

No. 2:11-CV-0276-RWS-JCF, 2013 WL 2099137, at *15 (N.D. Ga. Mar. 21, 2013)

("[B]ad faith essentially requires that a party tampered with the evidence."

(internal quotation marks omitted)), *adopted by* 2013 WL 2096658 (N.D. Ga. May

13, 2013).

Here, there is no specific evidence as to why Defendant did not preserve

Kadric's emails. However, Plaintiff has introduced evidence that another manager

witnessed Stinson and Taylor attempting to gain access to Plaintiff's email account

on the night that she was terminated. (*See* Doc. 67-9 at p. 8-10, 80:19-82:12 (Sherry

Melson deposition)); *see also Bashir*, 119 F.3d at 931 (declining to make an adverse

inference "unless the circumstances…indicate bad faith, e.g., that [defendants]

tampered with the evidence"). This evidence, which Defendant fails to even

43

address in its response brief, raises a question of whether Stinson and Taylor tampered with evidence by deleting any relevant emails, including deleting copies of the alleged October 18 email sent by Kadric from their own email accounts. *See Pope v. Wal-Mart Stores East, LP*, No. 4:13-CV-00009-HLM, 2013 WL 12086325, at *7 (N.D. Ga. Nov. 12, 2013) ("Here, the Court is faced with a close call [as to whether the defendant acted in bad faith.] While there is no record evidence that Defendant intentionally destroyed the Surveillance Video in anticipation of this litigation, to describe Defendant's post-incident investigation as simply 'negligent' also understates what the record shows. Consequently, taking the whole of the circumstances into account, the Court finds that the record evidence is sufficient to let a jury decide whether Defendant acted in bad faith."). As in *Pope*, the Court finds that the record evidence in this case "is sufficient to let a jury decide whether Defendant acted in bad faith." 2013 WL 12086325, at *7; *see also Woodward v. Wal-Mart Stores East, LP*, 801 F. Supp. 2d 1363, 1375 (M.D. Ga. 2011) (allowing the jury to decide bad faith).

As to the fourth factor, this Court concludes that there is a potential for abuse. "Although the leading cases on spoliation sanctions…involve the potential for abuse by experts, the analysis under this…spoliation factor is focused on whether the non-spoliating party, despite its ability to present evidence in support

of its claims, has had a full opportunity to discover the most relevant and most reliable evidence." *Connor*, 546 F. Supp. 2d at 1377 (citing *Flury*, 427 F.3d at 946). Here, Plaintiff has not had such an opportunity because Defendant's failure to produce Kadric's emails raises doubts about whether the alleged October 18 email existed. The non-existence of that alleged email supports Defendant's proffered legitimate reason for Plaintiff's termination (the escalating disciplinary actions, one of which was based on Plaintiff's alleged failure to notify her supervisors of her work injury on October 18). Therefore, the Court concludes spoliation of evidence has occurred and that Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether sanctionable spoliation occurred regarding Defendant's failure to preserve Kadric's emails. When presented with similar facts in *Pope* (where the question of bad faith was close), Judge Murphy permitted the question of bad faith to go to the jury and, for purposes of summary judgment, assumed that the missing evidence would have been adverse to the defendant. 2013 WL 12086325, at *4 ("For the following reasons, the Court finds that there is a genuine issue of material fact as to whether sanctionable spoliation occurred in this case. As such, for purposes of Defendant's Motion for Summary Judgment, this Court must assume that the missing video would have been adverse to Defendant."), at *11 (drawing the inference for purposes of summary

judgment and noting that, if the case reached a jury, the court would instruct the jurors to infer that the video would have been adverse to the defendant if the jurors found that the defendant acted in bad faith). The undersigned makes the same recommendation here.

For the reasons set forth above, the Court **RECOMMENDS** that Plaintiff's motion for sanctions, (Doc. 67), be **GRANTED IN PART AND DENIED IN PART**. Specifically, the undersigned **RECOMMENDS** that the motion be **GRANTED** only as to Defendant's failure to preserve Hajra Kadric's emails and **RECOMMENDS** that, for purposes of the cross-motions for summary judgment, the Court assume that the missing emails would have included the email that Kadric allegedly sent to Stinson and Taylor on October 18, 2018, reporting Plaintiff's injury the day that it occurred. Further, should this case reach a jury, the undersigned **RECOMMENDS** that the Court instruct the jurors that, if they find that Defendant acted in bad faith in failing to preserve Kadric's emails, they may infer that the deleted emails would have included the email that Kadric allegedly sent to Stinson and Taylor on October 18, 2018, reporting Plaintiff's injury the day that it occurred.[15]

---

[15] Plaintiff requests attorneys' fees related to the motion for sanctions and for her efforts to obtain the destroyed items. (Doc. 67 at 16). In light of the

### III.   MOTIONS FOR SUMMARY JUDGMENT

The parties have filed cross-motions for summary judgment in this case. (Docs. 104, 107). As the parties have filed motions for summary judgment as to all of Plaintiff's claims, the Court will consider each claim in turn.

### A.      *Summary Judgment Standard*

Summary judgment is authorized when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018). The movant carries this burden by showing the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *See Crane v. Lifemark Hospitals, Inc.*, 898 F.3d 1130, 1134 (11th Cir. 2018).

---

recommended resolution of the motion, I further recommend that the request for attorney's fees be denied without prejudice, subject to being raised again depending on the jury's finding on bad faith.

Once the moving party has adequately supported its motion, the non-moving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The non-moving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-moving party's case is insufficient to defeat a motion for summary judgment; rather, there must be evidence on which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-moving party cannot defeat summary judgment by relying upon conclusory assertions. *Holifield v. Reno,* 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997). Rather, "[a] party asserting that a fact…is genuinely disputed must support the assertion by…citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (*en banc*) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Anderson,* 477 U.S. at 249-50. A factual dispute is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259 (internal quotation marks omitted).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See id.* at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable

substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not preclude the entry of summary judgment. *Id*.

Further, the Rule 56 standard "is not affected by the filing of cross-motions for summary judgment: [t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Gaylor v. Greenbriar of Dahlonega Shopping Ctr., Inc.*, 975 F. Supp. 2d 1374, 1382 (N.D. Ga. 2013) (internal quotation marks omitted). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id*. (citing *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984)).

### B.   *Unexhausted or Unpled Claims*

As an initial matter, Defendant argues, in its motion for summary judgment and in its response to Plaintiff's motion for summary judgment, that certain of Plaintiff's claims in this case are not administratively exhausted or were not adequately pled in her complaint. The Court considers these arguments first.

## 1.    *ADA Allegations*

Defendant contends that the only purported discriminatory acts alleged in Plaintiff's EEOC charge are that Plaintiff asked her supervisor, Taylor, for leave on November 9 and was discharged. (Doc. 107-1 at 8; Doc. 112 at 12). As such, Defendant argues that Plaintiff cannot attempt to expand her ADA claims with new allegations in the complaint relating to alleged requests for leave or breaks[16] on October 29 or November 8 because these allegations are outside of the scope of (and do not reasonably grow out of) her EEOC charge. (Doc. 107-1 at 9-11; Doc. 112 at 12-14; Doc. 117 at 6). Plaintiff responds that all of her claims are exhausted because she noted in her EEOC charge that the earliest date the alleged discrimination took place was October 18, 2018, and that the latest date the alleged discrimination took place was November 9, 2018. (Doc. 111 at 7-8; Doc. 116 at 8).

"An employee making a discrimination claim under the ADA must first exhaust her administrative remedies by filing a Charge of Discrimination with the

---

[16] Plaintiff has waived any claim that Defendant failed to provide her with the reasonable accommodation of breaks, as she does not raise this claim in either her motion for summary judgment or her response to Defendant's cross-motion for summary judgment. (*See* Doc. 104-1 at 13-15; Doc. 111 at 20-22). Her failure to accommodate claim in both briefs focuses only on Defendant's alleged failure to provide her with leave as a reasonable accommodation. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief… are deemed waived.").

EEOC." *Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018). "The purpose of this requirement is to allow the EEOC the first opportunity to investigate the alleged discriminatory practices and perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Id.* (internal quotation marks and alteration omitted). Therefore, "a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (internal quotation marks omitted). The Eleventh Circuit has held that "judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate." *Batson*, 897 F.3d at 1327 (internal quotation marks omitted). All that being said, "the scope of an EEOC complaint should not be strictly interpreted" and the Eleventh Circuit has been "extremely reluctant to allow procedural technicalities to bar claims brought under discrimination statutes." *Id.* (internal quotation marks and alteration omitted). To determine whether Plaintiff has exhausted her administrative remedies as to her ADA claims, then, "the proper inquiry is whether plaintiff's complaint is like or related to, or grew out of, the allegations contained in the EEOC charge." *Id.* at 1328 (internal quotation marks and alterations omitted).

Here, in her EEOC charge, Plaintiff checks the boxes for discrimination based on disability and retaliation, states that the earliest date that discrimination occurred was October 18, 2018, with the latest date being November 9, 2018, and states, in part, that "[o]n November 9, [Plaintiff] asked [her] supervisor, Angela Taylor, for time off to recover" from her work injury. (Doc. 95-24 at 1). The Court finds that Plaintiff exhausted her administrative remedies because, based on the facts in her EEOC charge (alleging in part that she requested the accommodation of leave on November 9, 2018, and stating that the earliest date that the alleged discrimination began was October 18, 2018), the EEOC's investigation "would have reasonably uncovered" any evidence that Plaintiff previously requested leave during that period on October 29, 2018, or November 8, 2018. *Gregory*, 355 F.3d at 1280.

Further, the cases cited by Defendant in support of its argument are not analogous to the facts here. (*See* Doc. 112 at 13; Doc. 117 at 6); *see also Rodriguez v. Sec'y of Dep't of Veterans Affairs*, 605 F. App'x 957, 958 (11th Cir. 2015) (holding that that district court did not err in granting summary judgment because the plaintiff failed to exhaust her administrative remedies with regard to a hostile work environment charge based on allegations of mocking that "was not 'like or related to,' nor does it appear to have grown out of" her EEOC charge of a hostile work

environment "based on other specific, discrete events including assignment of duties, performance evaluations, and compensation"); *Albu v. TBI Airport Mgmt.*, No. 1:15-CV-03120-WSD-JCF, 2016 WL 11467718, at *3 (N.D. Ga. Sept. 26, 2016) (finding claims unexhausted where the EEOC charge brought claims based on a 2014 failure to promote, January 2015 warning and suspension, and retaliation after the filing of a June 2015 EEOC charge but the plaintiff attempted to bring claims based on a variety of other factual predicates), *adopted by* 2016 WL 6246732 (N.D. Ga. Oct. 26, 2016); *McCray v. Wal-Mart Stores, Inc.*, No. 1:06-cv-1123-MEF, 2009 WL 734138, at *8 (M.D. Ala. Mar. 17, 2009) (finding that the plaintiff's "general allegations of discrimination in the EEOC complaint [where the only specific allegation was that she was wrongfully terminated after being accused of theft] would not likely lead to an investigation regarding pay, scheduling, discipline, training, promotion, retaliation (for incidents other than her allegedly retaliatory discharge) and hostile work environment racial harassment").

Unlike in the cases cited by Defendant, Plaintiff's claim that she requested leave on October 29 and November 8 based on her October 18 work-related injury is "like or related to" the claim stated in her EEOC charge that she requested leave on November 9 based on her October 18 work-related injury. The earliest and latest dates of discrimination listed in the charge encompass October 29 and

November 8, and it is reasonable to think that an EEOC investigation would reasonably include requests for leave made on the same basis and in the same time frame as that alleged in the EEOC charge. Accordingly, the Court **RECOMMENDS** that Defendant's motion for summary judgment as to Plaintiff's claims for failure to accommodate prior to November 9, 2018 on the basis that any such claims are unexhausted be **DENIED**.

### 2. *FMLA Interference Allegations*

Defendant also argues, in its response to Plaintiff's motion for summary judgment, that Plaintiff did not plead an FMLA interference claim in her complaint based on Defendant's alleged failure to comply with the FMLA's notice provisions. (Doc. 112 at 5). Plaintiff's FMLA interference claim raised in her complaint alleges that Plaintiff was entitled to FMLA leave due to a serious health condition and Defendant interfered with her FMLA leave "by refusing to provide Plaintiff…with her entitled twelve weeks of FMLA leave and by terminating Plaintiff…in violation of the FMLA." (Doc. 1 at ¶¶ 67-78). Nowhere in the complaint, including the facts section, does Plaintiff attempt to assert an interference claim based on Taylor's purported failure to comply with FMLA notice provisions (or make any reference to not receiving notice regarding the FMLA). *See generally id*. In her motion for summary judgment and her response to

55

Defendant's motion for summary judgment, Plaintiff now raises for the first time an FMLA interference claim based on Taylor's purported failure to comply with certain FMLA notice provisions. (Doc. 104-1 at 9-13; Doc. 111 at 22-25).

However, as Defendant correctly notes, such an interference claim was not pled in the complaint and cannot be raised for the first time at the summary judgment stage. *See Hein v. IMS Gear Holding, Inc.,* No. 2:16-CV-81-RWS-JCF, 2018 WL 1833254, at *12-13 (N.D. Ga. Jan. 31, 2018) (finding that the defendants were entitled to summary judgment on the plaintiff's claims that the defendants violated the FMLA's notice requirements where the plaintiff's complaint alleged FMLA interference based on work assignment but "did not allege that Defendants failed to give FMLA notice as required"), *adopted by* 2018 WL 1882813 (N.D. Ga. Feb. 27, 2018); *Klein v. L-3 Commc'ns Corp.,* No. 1:12-cv-956-MEF, 2013 WL 5913776, at *12-13 (M.D. Ala. Nov. 1, 2013) (declining to consider plaintiff's FMLA interference claim based on failure to provide notice, which she asserted in her response to defendant's motion for summary judgment, where the complaint only alleged an FMLA interference claim based on failure to reinstate); *see also Monaghan v. Worldpay US, Inc.,* 955 F.3d 855, 859 (11th Cir. 2020) ("[A] plaintiff cannot amend her complaint through argument made in her brief in opposition to the defendant's motion for summary judgment." (internal quotation marks and

alterations omitted)); *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) ("[T]he Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a). This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.… At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Plaintiff suggests that the legal theory—FMLA interference—should be broadly read to include *any* FMLA interference claim. (Doc. 116 at 4). But there are different ways to allege FMLA interference and, as the courts recognized in *Hein* and *Klein*, those theories must be alleged in the complaint. Because Plaintiff did not plead an FMLA interference claim based on failure to provide notice and did not amend her complaint to add such a claim, the Court will only analyze Plaintiff's FMLA interference claim as it is pled in the complaint. Accordingly, the Court **RECOMMENDS** that the District Judge not consider Plaintiff's FMLA interference claim to the extent that it is based on Taylor's failure to comply with the FMLA's notice provisions.

### *3.    FMLA Retaliation Claim*

Defendant further asserts that Plaintiff did not plead an FMLA retaliation claim. (Doc. 107-1 at 27 n.4). Plaintiff does not directly respond to this claim, though she notes in her motion for summary judgment that she moves for summary judgment as to "Counts I, II, III and IV of her Complaint" and that she "has additionally alleged an FMLA retaliation claim but does not move for summary judgment on that claim." (Doc. 104 at 1, 3). In her response to Defendant's motion for summary judgment, Plaintiff has a subheading titled "FMLA interference and retaliation (Count IV)." (Doc. 111 at 22). Count Four of Plaintiff's complaint has the heading "Interference with FMLA Rights" and references only Defendant's alleged interference with her FMLA leave by refusing to provide her with that leave and by terminating her. (Doc. 1 at ¶¶ 67-78). Plaintiff's complaint does not plead a claim of retaliation under the FMLA. (*See generally* Doc. 1). To the extent that Plaintiff is attempting to raise a claim of retaliation under the FMLA through her motion for summary judgment or response to Defendant's motion for summary judgment, she cannot do so. *See Monaghan*, 955 F.3d at 859 ("[A] plaintiff cannot amend her complaint through argument made in her brief in opposition to the defendant's motion for summary judgment." (internal quotation marks and alterations omitted)).

### C.     ADA

Plaintiff has brought claims of retaliation, discriminatory discharge, and failure to accommodate under the ADA. (Doc. 1 at ¶¶ 45-66). Plaintiff and Defendant have filed cross-motions for summary judgment on Plaintiff's ADA claims. The Court will analyze each of Plaintiff's ADA claims in turn.

### 1.     ADA Standards

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability" concerning hiring, promotion, discharge, compensation, training, job application procedures, or "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The definition of discriminate includes a failure to make reasonable accommodations to the limitations of a qualified individual with a disability unless the employer can demonstrate that the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A). The term "disability" means a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(1).

"[T]here are two distinct categories of disability discrimination claims under the ADA: (1) failure to accommodate and (2) disparate treatment." *E.E.O.C. v. Eckerd Corp.*, No. 1:10-CV-2816-JEC, 2012 WL 2568225, at *4 (N.D. Ga. July 2, 2012).

The ADA also "prohibits retaliation against an individual for opposing an unlawful practice or making a charge under the ADA." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing 42 U.S.C. § 12203(a)).

Courts examine ADA disparate-treatment claims under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). The initial burden is on the plaintiff to establish a *prima facie* case of discrimination by showing a disability, that she was otherwise qualified to perform her job, and that she was discriminated against based upon the disability. *Id*. The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the termination or other adverse employment action. *Id.* If the defendant does so, the plaintiff must then show that this reason is unworthy of credence and a pretext for discrimination. *Id.*

The *McDonnell Douglas* burden-shifting framework, however, is not applicable to reasonable accommodation cases. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) (noting that for a failure-to-accommodate claim, there are no "subsequent burdens on [defendant] to show that it had any legitimate non-discriminatory reasons for terminating [plaintiff] or on [plaintiff] to establish that these reasons were pretextual" (internal quotation marks

omitted)); *Cappetta v. N. Fulton Eye Ctr.*, No. 1:15-CV-3412-LMM-JSA, 2017 WL 5197207, at *20 (N.D. Ga. Feb. 1, 2017) ("For those cases in which an employee claims that an employer violated the ADA by failing to provide a reasonable accommodation for the employee's disability, however, the Eleventh Circuit has held that the *McDonnell Douglas Corp.* burden-shifting framework does not apply."), *adopted by* 2017 WL 5443877 (N.D. Ga. Mar. 7, 2017). To establish a *prima facie* case with respect to a reasonable accommodation claim, "a plaintiff must demonstrate that: (1) she is disabled; (2) she was a 'qualified individual' when she suffered the adverse employment action; and (3) that she was discriminated against because of her disability by being denied a reasonable accommodation to allow her to keep working." *Cappetta*, 2017 WL 5197207, at * 25; *see also Holly*, 492 F.3d at 1262-63.

And finally, for ADA retaliation claims, the full burden-shifting analysis of *McDonnell Douglas* applies. *Batson*, 897 F.3d at 1328–29. "To establish a prima facie case of retaliation…an employee must demonstrate (1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two." *Id*. at 1329. If the employee establishes a *prima facie* case, the burden shifts to the employer to articulate a non-discriminatory reason. *Id.* If the employer does so, the burden

shifts back to the employee to demonstrate that the employer's reason is pretextual. *Id*.

### 2.      *Discriminatory Discharge (Count Two)*

For ease of analysis, the Court considers Plaintiff's discriminatory discharge claim first. In Count Two, Plaintiff asserts that Defendant discriminated against her in violation of the ADA when it terminated her because of her disability and/or because it regarded her as being disabled. (Doc. 1 at ¶¶ 53-58). In her motion for summary judgment, Plaintiff argues that she has established a *prima facie* case by showing that she was disabled, was qualified, and was subjected to unlawful discrimination based on Defendant's belief that her disability would decrease the Club's profitability. (Doc. 104-1 at 16-17). She contends that pretext can be inferred from texts describing her need for leave as a "major loss" and connecting her pain and the need for leave with disciplinary actions, as well as the nature and timing of the disciplinary actions that purportedly led to her termination. *Id*. at 16-25. In response, Defendant argues that Plaintiff is not entitled to summary judgment on her discriminatory discharge claim because she cannot establish a single element of her *prima facie* case. (Doc. 112 at 15-18). Defendant asserts that Plaintiff has not shown that its legitimate non-discriminatory reasons for her termination—her three written coachings and alleged failure to prepare for

the one-day sale—are pretextual because she cannot dispute the bases for the disciplinary coachings that she received. *Id*. at 18-25.

Defendant makes the same arguments in support of its cross-motion for summary judgment. (Doc. 107-1 at 11-17). In response to Defendant's cross-motion, Plaintiff argues that she has established the elements of her *prima facie* case, that the evidence she has provided that her disability and/or request for leave caused her termination satisfy the standard set forth in *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), and that Defendant's stated reason for terminating her is pretextual. (Doc. 111 at 9-20). Plaintiff and Defendant each filed reply briefs in support of their respective cross-motions, reiterating the claims from their initial briefs. (Doc. 116 at 9-15; Doc. 117 at 8-10).

### a. Actually Disabled

Courts examine ADA disparate-treatment claims under the burden-shifting framework set out in *McDonnell Douglas*. *See Cleveland*, 369 F.3d at 1193. The initial burden is on the plaintiff to establish a *prima facie* case of discrimination by showing a disability (or that she was regarding as having a disability), that she was otherwise qualified to perform her job, and that she was discriminated against based upon the disability. *Id*. The burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the termination or other adverse

employment action. *Id.* If the defendant does so, the plaintiff must then show that this reason is unworthy of credence and a pretext for discrimination. *Id.*

Regarding the first element of Plaintiff's *prima facie* case, "[a]n individual has a disability if she has 'a physical or mental impairment that substantially limits one or more of [her] major life activities.'" *Danielle-DiSerafino v. Dist. Sch. Bd. of Collier Cnty.,* 756 F. App'x 940, 943 (11th Cir. 2018) (quoting 42 U.S.C. § 12102(1) (second alteration in original)). Major life activities include performing manual tasks, sleeping, walking, standing, lifting, bending, speaking, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A). "Congress amended the ADA by enacting the ADA Amendments Act of 2008 (the 'ADAAA') with the goal of broadening the interpretation of a disability under the ADA." *Lewis v. City of Union City,* 934 F.3d 1169, 1180 (11th Cir. 2019). "[C]ourts are instructed that 'the term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.'" *Vaughan v. World Changers Church Int'l, Inc.,* No. 1:13-CV-0746-AT, 2014 WL 4978439, at *8 (N.D. Ga. Sept. 16, 2014) (quoting 29 C.F.R. § 1630.2(j)(1)(i) (alteration omitted)). "Under this more lenient standard, courts consider whether an impairment 'substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *Id.* at *9

64

(quoting 29 C.F.R. § 1630.2(j)(ii)). "[E]ven temporary impairments—those lasting less than six months—can be substantially limiting within the meaning of § 12102(1)(A)." *Id.* "Despite this generous standard, not every impairment will constitute a disability with[in] the meaning" of the Act. *Id.* (internal quotation marks omitted). Further, "[p]ain alone is insufficient to establish a disability if the evidence does not show impairment of a major life activity." *Danielle-DiSerafino*, 756 F. App'x at 943 (citing *EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1344 (11th Cir. 2016)).

Plaintiff asserts that she was actually disabled because of her October 18 back injury. (Doc. 104-1 at 16).[17] In support of her claim that her back injury substantially limited one or more major life activities, Plaintiff asserts that her injury "progressively worsened" and "substantially limited at least her ability to sleep, walk, and do household tasks," (Doc. 104-1 at 16), as well as "substantially limited her ability to lift to five pounds and fully prevented her from bending (i.e. kneeling and squatting)," (Doc. 111 at 10). Plaintiff points to her deposition

---

[17] Plaintiff asserts in her response to Defendant's motion for summary judgment and in her statement of additional material facts that she had a herniated disk in her lower back. (Doc. 111 at 10; Doc. 111-2 at ¶ 39). However, nowhere in the medical evidence Plaintiff cites in support, (Doc. 104-7), is there a diagnosis that Plaintiff had a herniated disc, and thus, the Court does not consider this alleged fact.

testimony, in which she testifies that her back injury causes "severe pain" and that she had "a lot of issues sleeping … a lot of issues doing [her] daily tasks at home." (Doc. 104-1 at 16 (citing Doc. 95 at 216:24, 218:15-20)). Plaintiff cites Taylor's deposition testimony that Plaintiff told Taylor that she could not walk up the steps to the manager's office. (Doc. 97 at 230:3-17).

Plaintiff also cites to her medical records, which show three sets of work restrictions. First on October 23, 2018, Plaintiff's physician diagnosed her with muscle strains and sciatica and allowed her to return to work that day and to work her entire shift but issued the following work restrictions to be in effect until her next appointment on October 25, 2018: may lift up to 5 pounds constantly (up to 8 hours or greater per day), may push/pull up to 15 pounds constantly (up to 8 hours or greater per day), no squatting, kneeling, or bending. (Doc. 104-7 at 2). On October 25, 2018, Plaintiff's physician again listed muscle strains as the diagnosis and allowed her to return to work that day but issued the following work restrictions to be in effect until October 29, 2018: no kneeling or squatting, Plaintiff could push and pull up to 15 pounds for up to 8 hours per day, and Plaintiff could lift no more than 5 pounds for more than 8 hours per day. *Id*. at 1. On November 8, 2018, Plaintiff's orthopedic doctor listed no diagnosis but issued the following work restrictions to be in effect until November 21, 2018: no lifting greater than 20

pounds, no pushing or pulling greater than 20 pounds, no prolonged standing or walking greater than 45 minutes per hour, no excessive bending at the waist, no ladder or repetitive stair climbing, and alternate standing and sitting frequently. *Id.* at 11. Also on November 8, 2018, Plaintiff was released from the ER with the note that she could return to work on November 10, 2018 without any restrictions. *Id.* at 23.

The undersigned finds that Plaintiff has failed to produce sufficient evidence to raise a jury question regarding whether she was disabled under the terms of the ADA. Plaintiff alleges that her physical impairment affected the major life activities of sleeping, walking, doing household tasks, lifting, and bending. (*See* Doc. 104-1 at 16; Doc. 111 at 10). First as to sleeping, walking, and doing household tasks, Plaintiff points to her own testimony summarily stating that she had a "lot of issues" sleeping and doing daily tasks (without even specifying what daily tasks she had issues with), but the cited testimony, (Doc. 95 at 216:19-219:9), "is devoid of evidence of the severity, frequency, and duration" of her issues or "any evidence of the extent to which [the impairment] limit[s]" the alleged major life activities. *Lewis*, 934 F.3d at 1180. Similarly, Plaintiff's citation to Taylor's deposition testimony that Plaintiff had told Taylor that she could not walk up the steps to the manager's office on a particular day, (Doc. 97 at 230:3-17), does not

"point to evidence of the frequency or duration of her pain." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1273 (11th Cir. 2020) (holding that "Ms. Munoz has not provided evidence of how often and how long she experienced these symptoms. We therefore cannot assess whether her impairments substantially limited her ability to work or sleep as compared to most people in the general population").

Plaintiff points to the first set of work restrictions as supporting the conclusion that her back injury substantially limited her ability to lift and bend. (Doc. 111 at 10 (citing to Doc. 104-7 at 2 (the October 23 restrictions limiting Plaintiff to lifting up to 5 pounds constantly and no squatting, kneeling, or bending))). However, these restrictions only applied by their stated terms until October 25, 2018. (Doc. 104-7 at 2). The next set of restrictions imposed on October 25, 2018 (and in effect until October 29) contained the same limitation on lifting more than five pounds, but did not include a restriction on bending. *Id.* at 1. By November 8, 2018, Plaintiff's orthopedic doctor's work restrictions (which were to be in effect for two weeks, until November 21, 2018) allowed Plaintiff to lift up to 20 pounds and called for no "excessive" bending at the waist. *Id.* at 11. And the ER doctor imposed no work restrictions at all. *Id.* at 23.

Plaintiff cites *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1269-70 (11th Cir. 2014), and argues that the "Eleventh Circuit found a similar back

condition where the employee could lift up to ten pounds to be a disability." (Doc. 111 at 10). But the medical evidence in *Mazzeo* is not analogous to the evidence in this case. In *Mazzeo*, the plaintiff's treating physician submitted an affidavit stating that he had treated the plaintiff for an extended period of time, that degenerative disc disease and a herniated disc impacted the plaintiff's ability to walk, bend, sleep, and lift more than ten pounds, and "that the limitations he noted (i.e., the impact on [the plaintiff's] ability to walk, bend, sleep, and lift more than ten pounds) were 'substantial and permanent.'" 746 F.3d at 1268-89 (alteration omitted). Here, the restrictions placed on Plaintiff, by their terms, only remained in effect for a number of days or up to a few weeks and there is no evidence that Plaintiff's doctors viewed the limitations imposed as "substantial." Further, Plaintiff relies on the October 23 limitations that she lift no more than five pounds and that she was fully restricted from bending, but the record shows that by just over two weeks later, those restrictions were modified to allow lifting up to 20 pounds and no "excessive" bending. (*See* Doc. 104-7 at 1-2, 11).

In *Vaughan*, the court distinguished the plaintiff's medical evidence that she suffered from an impairment that substantially limited any major life activity from the evidence in *Mazzeo*:

69

> Here, in contrast [to *Mazzeo*], although Vaughan's treating physician diagnosed her with several conditions (lumbar sprain/strain, muscle spasms, and an ankle sprain), he offered nothing specific regarding the pain these conditions caused. Vaughan's treating physician did not, even in a conclusory fashion, state that the effects of this pain on her major life activities—the inability to sit or stand for prolonged periods of time—were at all substantial, or at least substantial as compared to most people in the population. Finally Vaughan's physician … anticipated that Vaughan would return to work full-time quickly. This medical certification does not raise an inference that Vaughan suffered from an impairment that substantially limits any major life activity, even under the relaxed standards of the ADAAA.

2014 WL 4978439, at *9. The court in *Vaughan* then found that the plaintiff's affidavit "offers no additional clarity as to her medical condition and what specific pain it caused" and her deposition testimony was "no more specific." *Id.* (finding that the plaintiff's testimony that "'walking was an issue for her' … might suggest that Vaughan's major life activities were limited as compared to how they were before she had her accident, but [that testimony] says nothing about how they compare 'to most people in the general population'"). Accordingly, the court in *Vaughan* determined that the plaintiff had not set forth evidence from which to infer that Vaughan suffered from a disability, within the meaning of the ADA. *See id.* at *10.

So too, here, there is nothing in the record showing that Plaintiff's physicians determined that the effects of her back pain (i.e., the temporary lifting

and bending restrictions placed on her) "were at all substantial, or at least substantial as compared to most people in the population." *Vaughan*, 2014 WL 4978439, at *9-10; *see also Sierra v. Port Consol. Jacksonville, L.L.C.*, No. 3:14-cv-1496-HES-JBT, 2016 WL 927189, at *5 (M.D. Fla. Mar. 3, 2016) (finding that the plaintiff had not come forward with sufficient evidence to support his argument that he was actually disabled where the plaintiff "provided no evidence that his 50 pound lifting restriction substantially limits the major life activity of lifting more generally"). Rather, the evidence shows that Plaintiff's various restrictions were in place for only a few weeks and the limitations imposed on Plaintiff's lifting and bending became progressively less restrictive. (*See* Doc. 104-7 at 1-2, 11). Plaintiff's own testimony is vague and conclusory and "offers no additional clarity" about the specific limitations upon Plaintiff and whether they were substantial in their effect on her major life activities. *Vaughan*, 2014 WL 4978439, at *9-10. The Court finds that Plaintiff has not produced sufficient evidence to raise a genuine issue of fact as to whether she was actually disabled.

### b. *Regarded as Disabled*

Alternatively, as to the "regarded as having" definition of the first element of a *prima facie* case, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been

subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). "In short, to qualify for coverage under the 'regarded as' prong, an individual is not subject to any functional test and is not required to establish his employer's beliefs concerning the severity of the impairment." *Jordan v. City of Union City*, 94 F. Supp. 3d 1328, 1336 (N.D. Ga. 2015) (internal quotation marks omitted). "To defeat summary judgment on this element, Plaintiff is only required to raise a genuine issue of material fact about whether [her] employer regarded [her] as having a mental or physical impairment." *Id*. (internal quotation marks and alteration omitted).

Plaintiff does not allege in her motion for summary judgment that she qualifies under the "regarded as disabled" prong. (*See* Doc. 104-1). However, she does make this argument in her response in opposition to Defendant's motion for summary judgment—Plaintiff asserts that Taylor regarded her as disabled, as evidenced by Taylor's November 6 text message that Plaintiff "is constantly saying she is in pain and not working." (Doc. 111 at 10). Defendant argues that Taylor's text message merely relayed what Plaintiff said to Taylor and does not indicate that Taylor believed Plaintiff or regarded Plaintiff as having a disability. (Doc. 117

at 9). Defendant asserts that Taylor sent the text message to Stinson to let him know that Taylor believed Plaintiff was attempting to "dodge" Taylor and avoid receiving a coaching. *Id*.

The text message Plaintiff references from Taylor to Stinson states that Plaintiff "is constantly saying she is in pain and not working. How should we proceed with her? I am going to have James enter the 3rd level coaching into the system. I really believe she is dodging me so I cannot administer the coaching." (Doc. 97-20 at 1). Neither party cites to relevant case law on this issue. The Court finds that, even construed in the light most favorable to Plaintiff, Taylor's text message is not sufficient to create an issue of fact as to whether Defendant regarded Plaintiff as disabled. Read in context, Taylor's text message is concerned with her belief that Plaintiff was "dodging" her to avoid being assessed another written coaching. The text message does not indicate Taylor's beliefs regarding whether Plaintiff was disabled. Further, the text message, which only mentions Plaintiff's complaints of being in pain, does not "support an inference that" Taylor regarded Plaintiff as "having a physical or mental impairment that substantially limited one of more major life activities." *Wood v. Gilman Bldg. Prods. Inc.*, 769 F. App'x 796, 800-01 (11th Cir. 2019). Plaintiff has not produced sufficient evidence to raise a genuine issue of fact that Defendant regarded her as disabled.

73

Because there is no genuine issue of material fact as to whether Plaintiff was disabled or whether Defendant regarded Plaintiff as disabled, Plaintiff cannot establish a *prima facie* case, her claim for discriminatory discharge fails, and Defendant is entitled to judgment as a matter of law. Accordingly, the undersigned **RECOMMENDS** that Plaintiff's cross-motion for summary judgment on her discriminatory discharge claim be **DENIED** and that Defendant's cross-motion for summary judgment on this claim be **GRANTED**.

### 3. *Failure to Accommodate (Count Three)*

Plaintiff's next ADA claim asserts that Defendant failed to provide Plaintiff with reasonable accommodations as the ADA requires. (Doc. 1 at ¶¶ 59-66). In her cross-motion, Plaintiff argues that Defendant violated the reasonable accommodation requirement when it failed to accommodate her with a leave of absence and then fired her for allegedly failing to adequately prepare for the one-day sale during a time when she should have been on ADA-protected leave. (Doc. 104-1 at 13-15). In response, Defendant argues that Plaintiff has not administratively exhausted any alleged requests for leave on October 28 or 29 or November 8. (Doc. 112 at 11-14).[18]  Defendant argues that it had nothing to do with

---

[18] The Court recommends above that this argument be denied because it found that an EEOC investigation would have reasonably included Plaintiff's

Plaintiff's decision to come back early from her FMLA maternity leave and that the undisputed evidence shows that Taylor had already received approval to terminate Plaintiff before Plaintiff requested PTO on November 9. *Id*. at 14-15.

In its cross-motion for summary judgment, Defendant argues that Plaintiff cannot make out a *prima facie* case of failure to accommodate because she cannot show that she was disabled or qualified to perform the essential functions of her job. (Doc. 107-1 at 23). Defendant also argues that Plaintiff cannot establish that Defendant failed to provide a reasonable accommodation because she never requested an accommodation for her purported disability that was denied and because Taylor had already received approval to terminate Plaintiff before Plaintiff requested PTO on November 9. *Id*. at 24-25. In response, Plaintiff argues that she has established that Defendant denied her the reasonable accommodation of leave after she provided enough information beginning on October 28 or 29 to suggest the need for an accommodation. (Doc. 111 at 20-22). Plaintiff and Defendant each filed reply briefs in support of their respective cross-motions, reiterating the claims from their initial briefs. (Doc. 116 at 7-8; Doc. 117 at 5-8).

---

alleged requests for leave on October 28 or 29 or November 8. *See supra* Section III.B.1.

To establish a *prima facie* case with respect to a reasonable accommodation claim, "a plaintiff must demonstrate that: (1) she is disabled; (2) she was a 'qualified individual' when she suffered the adverse employment action; and (3) that she was discriminated against because of her disability by being denied a reasonable accommodation to allow her to keep working." *Cappetta*, 2017 WL 5197207, at * 25; *see also Holly*, 492 F.3d at 1262-63 (noting that for a failure-to-accommodate claim, there are no "subsequent burdens on [defendant] to show that it had any legitimate non-discriminatory reasons for terminating [plaintiff] or on [plaintiff] to establish that these reasons were pretextual" (internal quotation marks omitted)).

As discussed above with respect to Plaintiff's discriminatory discharge claim, because there is no genuine issue of material fact as to whether Plaintiff was disabled, Plaintiff cannot establish a *prima facie* case, her failure to accommodate claim fails, and Defendant is entitled to judgment as a matter of law. Accordingly, the undersigned **RECOMMENDS** that Plaintiff's cross-motion for summary judgment on her failure to accommodate claim be **DENIED** and that Defendant's cross-motion for summary judgment on this claim be **GRANTED**.

### 4. Retaliation (Count One)

In Count One of her complaint, Plaintiff alleges that Defendant retaliated against her in violation of the ADA because she requested leave as a reasonable accommodation. (Doc. 1 at ¶¶ 45-52). Plaintiff's cross-motion for summary judgment does not make specific arguments in support of her claim of retaliation under the ADA. (*See* Doc. 104-1 at 15-25 (stating that Taylor "terminated Plaintiff in violation of the ADA in retaliation for requesting leave" but then addressing only a *prima facie* case for discrimination under the ADA rather than the *prima facie* case for retaliation)). As Plaintiff does not make arguments in support of her motion for summary judgment as to her ADA retaliation claim, the undersigned **RECOMMENDS** that Plaintiff's cross-motion for summary judgment on her retaliation claim be **DENIED**.

In its cross-motion for summary judgment, Defendant argues that Plaintiff cannot make out a *prima facie* case of retaliation under the ADA because she cannot show that she engaged in protected activity or that there was any causal connection between her alleged protected activity and her termination. (Doc. 107-1 at 17-22). Defendant also argues that Plaintiff cannot show that Defendant's legitimate non-retaliatory reasons for her termination were pretextual. *Id.* at 22. In response, Plaintiff argues that she began engaging in protected activity on October

77

28 or 29 and that she does not need to be disabled to engage in protected activity. (Doc. 111 at 22). In reply, Defendant argues that Plaintiff did not complain of disability discrimination until after her termination and her alleged equivocal statements that she was "thinking about" taking leave do not constitute protected activity. (Doc. 117 at 10-11).[19]

For ADA retaliation claims, the full burden-shifting analysis of *McDonnell Douglas* applies. *See Batson*, 897 F.3d at 1328–29. "To establish a prima facie case of retaliation…an employee must demonstrate (1) that she engaged in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two." *Id*. at 1329. If the employee establishes a *prima facie* case, the burden shifts to the employer to articulate a non-discriminatory reason. *Id*. at 1329. If the employer does so, the burden shifts back to the employee to demonstrate that the employer's reason is pretextual. *Id*. Courts in the Eleventh Circuit "assess ADA retaliation claims under the same

---

[19] Defendant also argues that Plaintiff did not plead any facts alleging that she requested leave on October 28 or 29 in her ADA retaliation claim in her complaint and that these new allegations should not be considered. (Doc. 117 at 11). The Court does not consider this argument because it was brought for the first time in Defendant's reply brief. *See Rindfleisch*, 22 F. Supp. 3d at 1301 ("As a general rule, federal courts do not consider arguments that are presented for the first time in a reply brief.").

framework…employ[ed] for retaliation claims under Title VII." *Standard v.*
*A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998) (internal quotation marks omitted).

Defendant has conceded for the purposes of summary judgment that Plaintiff has established the second element of her *prima facie* retaliation case—that she suffered an adverse employment action when she was terminated. (Doc. 107-1 at 18). As to the first element, whether she engaged in statutorily protected conduct, Plaintiff asserts that she engaged in protected activity on October 28 or 29 when she alleges that she provided sufficient information of her need for leave. (Doc. 111 at 22). "[T]o satisfy the first element of the prima facie case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute." *Standard*, 161 F.3d at 1328. The plaintiff in *Standard* (like Plaintiff in this case) argued "that his requests for accommodation of his back injury constitute statutorily protected activity." *Id*. The Eleventh Circuit held that:

> [i]n this context, it would be sufficient for him to show that he had a good faith, objectively reasonable belief that he was entitled to those accommodations under the ADA. He cannot show this, however. Standard has not produced any evidence that, at the time that he requested accommodations for his back injury, his belief that he was disabled was objectively reasonable. He merely asserts that his back injury was a disability, without any grounds for the conclusion.

*Id*. Here, even assuming that Plaintiff requested leave on October 28 or 29, Plaintiff

nevertheless cannot show that she had an objectively reasonable belief that she was disabled. As discussed above, the medical limitations in the record show temporary lifting and bending restrictions that were progressively less restrictive. (*See* Doc. 104-7 at 1-2, 11). Further, Plaintiff's own testimony as to whether her limitations were substantial in their effect on her major life activities is vague and conclusory and "offers no additional clarity." *Vaughan*, 2014 WL 4978439, at *9-10. As in *Standard*, Plaintiff "has not produced…evidence that, at the time [s]he requested accommodations for [her] back injury, [her] belief that [s]he was disabled was objectively reasonable." 161 F.3d at 1328. Thus, the Court finds that Plaintiff has not established the first element of her *prima facie* case of retaliation.

However, even if Plaintiff had established an objectively reasonable belief that she was entitled to the ADA accommodation that she allegedly requested, she still fails to establish a *prima facie* case on her retaliation claim. Plaintiff's arguments as to her ADA retaliation claim consist of only two paragraphs that make up less than a page of her response. (*See* Doc. 111 at 22). Plaintiff's exceedingly brief argument as to this claim only discusses the first element of a *prima facie* case of retaliation and does not even address the third prong, a causal connection between the alleged protected activity and the adverse employment action. *Id*. This is simply insufficient to create an issue of material fact as to this claim. *See Resolution*

80

*Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (holding that, "[i]n opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (internal quotation marks and citations omitted)).

Because there is no genuine issue of material fact as to whether Plaintiff had an objectively reasonable belief that she was entitled to the accommodation she allegedly requested, Plaintiff cannot establish a *prima facie* case, her claim for ADA retaliation fails, and Defendant is entitled to judgment as a matter of law. Accordingly, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's ADA retaliation claim.

### D.    *FMLA Interference (Count Four)*

In Count Four, Plaintiff alleges that she was entitled to FMLA leave because of a serious health condition and Defendant interfered with her FMLA leave by refusing to provide her with that leave and by terminating her. (Doc. 1 at ¶¶ 67-78). In her cross-motion for summary judgment, Plaintiff argues that she had

81

FMLA leave available to her, she had a serious health condition, and she provided Defendant with sufficient information about her serious health condition. (Doc. 104-1 at 9-13).[20]  In response, Defendant argues that Plaintiff cannot show that she provided Defendant with sufficient notice of her intent to take FMLA leave and that she never actually requested leave until after the decision had been made to terminate her employment. (Doc. 112 at 5-11).

In its cross-motion for summary judgment, Defendant argues that Plaintiff's FMLA interference claim fails because she cannot demonstrate that she was denied any benefit that she was entitled to under the FMLA. (Doc. 107-1 at 25). Defendant argues that Taylor had already received approval to terminate Plaintiff before Plaintiff requested FMLA leave through Sedgwick on November 9. *Id.* at 26-27. In response, Plaintiff argues that her actions beginning on October 28 or 29 "were sufficient to invoke the FMLA" and that Taylor's November 6 text messages demonstrate that Defendant was aware of Plaintiff's need for leave and the major financial costs that would result before it decided to terminate her employment.

---

[20]  Plaintiff also argues that Defendant interfered with her FMLA rights because it failed to notify her of her eligibility for FMLA leave (Doc. 104-1 at 9-13). However, as discussed above, because Plaintiff did not plead an FMLA interference claim based on failure to provide notice and did not amend her complaint to add such a claim, the Court will only analyze Plaintiff's FMLA interference claim as it is pled in the complaint. *See supra* Section III.B.2.

(Doc. 111 at 22-24). Plaintiff further argues that she should have been on FMLA protected leave on November 9, the day she that was terminated and was entitled to reinstatement under the FMLA. *Id.* at 24-25. Plaintiff and Defendant each filed reply briefs in support of their respective cross-motions, reiterating the claims from their initial briefs. (Doc. 116 at 3-7; Doc. 117 at 11-12).

The FMLA grants an eligible employee the right to take up to twelve workweeks of unpaid leave during any twelve-month period for any one or more of several reasons, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). A "serious health condition" means "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care…or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided for under the FMLA, nor may an employer "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. §§ 2615(a)(1) and (2).

In an FMLA interference claim, "an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017) (internal quotation marks omitted). To establish an FMLA interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Strickland v. Water Works and Sewer Bd.*, 239 F.3d 1199, 1206–07 (11th Cir. 2001). The employee "does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant." *Id.* at 1208.

Defendant does not dispute that Plaintiff was generally eligible for leave under the FMLA. (*See* Docs. 107-1, 112, 117). However, Defendant contends that Plaintiff cannot show that she provided Defendant with "sufficient notice of her intent to take FMLA leave," as to her alleged October 28/29 and November 8 requests for leave, where she never provided notice of her need for leave to Sedgwick, Defendant's third-party leave administrator that conveys decisions regarding whether or not to grant an employee leave, (Doc. 111-1 at ¶ 109), prior to her formal request for FMLA leave on November 9. (Doc. 112 at 6-7).

### 1. *October 28/29 and November 8 Notice*

"An employee's notice of her need for FMLA leave must satisfy two criteria—timing and content—both of which differ depending on whether the

need for leave is foreseeable or unforeseeable." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1195 (11th Cir. 2015).[21]  As to timing, "an employee [whose need for leave is unforeseeable] must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). With respect to the content of the employee's notice, the Eleventh Circuit has held that, "[a]s a general rule, an employee need not explicitly mention the FMLA when giving notice to her employer." *White*, 789 F.3d at 1196; *see also Cruz v. Publix Super Mkts., Inc.*, 428 F.3d 1379, 1383 (11th Cir. 2005) ("An employee is not required to assert expressly her right to take leave under the FMLA."). The Eleventh Circuit has also held that, "[i]f the need for leave is *unforeseeable,* an employee need only 'provide sufficient information for [her] employer to reasonably determine whether the FMLA may apply to the leave request.' [29 C.F.R.] § 825.303(b)." *White*, 789 F.3d at 1196 (alterations added). Because Plaintiff's need for leave was unforeseeable, she was required to give notice only as early as

---

[21]  The parties do not discuss whether Plaintiff's need for FMLA leave should be viewed as foreseeable or unforeseeable. In *White*, the Eleventh Circuit concluded that "an employee's need for leave is foreseeable if it is based on planned medical treatment." 789 F.3d at 1196. Here, there is no evidence or argument that Plaintiff's need for leave due to her back injury was based on planned medical treatment. Thus, the Court finds that Plaintiff's need for leave was unforeseeable. *See id.*

was practicable, *see* 29 C.F.R. § 825.303(a), and her notice had to contain only "sufficient information for [Defendant] to reasonably determine whether the FMLA may apply to the leave request," *id.* at § 825.303(b).

Neither party cites to caselaw regarding whether an employer may require that notice be given to a third-party administrator. However, the Court need not decide whether Plaintiff's alleged October 28/29 and November 8 notice was insufficient because it was made to Taylor, rather than Sedgwick, because the alleged notice given on October 28/29 and November 8 was otherwise insufficient; it was too equivocal to constitute proper notice under the FMLA. Plaintiff's own testimony as to her alleged notice on October 28/29 is that she told Taylor that she "was considering time off" due to her back injury, (Doc. 95 at 185:14-15), she told Taylor that she "was probably going to take some time off," (*id*. at 268:11-13), and she had not made a firm decision to take leave as of October 28/29, (*id*. at 349:9-13 ("I did not specifically make…the decision. I just made her aware, hey, I am thinking about leave, I am not getting any better.")). Plaintiff's testimony as to her alleged notice on November 8 is that she told Taylor that she thought that she would be taking her baby bonding leave to get better. *Id.* at 191:7-18 ("I did tell her…that I strongly think that I would be taking my baby bonding leave just to get better.").

86

Courts have found that similarly uncertain statements do not constitute sufficient notice under the FMLA. *See, e.g., Sparks v. Sunshine Mills, Inc.*, 580 F. App'x 759, 766 (11th Cir. 2014) (holding that the plaintiff did not provide sufficient notice where he "merely informed his supervisors that 'it was looking like it was very possible [he was] going to have to have surgery'" (alteration in original)); *Gutter v. GuideOne Mut. Ins. Co.*, 17 F. Supp. 3d 1261, 1268 n.5 (N.D. Ga. 2014) (finding that an employee's notice that she "might" have to take medical leave was not sufficient). The Court finds that Plaintiff's own testimony shows that her alleged notice given on October 28/29 and November 8 was too uncertain to constitute sufficient notice under the FMLA.

### 2. *November 9 Notice*

Defendant does not dispute that Plaintiff's request to Sedgwick to take baby bonding leave and her request to Taylor to take PTO, both made on November 9, 2018, constituted sufficient notice of Plaintiff's need for leave under the FMLA. Instead, Defendant argues that Plaintiff's FMLA interference claim must fail as to the November 9 leave requests because it is undisputed that Taylor, the decisionmaker, had already decided to terminate Plaintiff and received approval to do so before Plaintiff requested baby bonding leave and PTO. (Doc. 107-1 at 26-27; Doc. 112 at 9-11). "[A]n employee can be dismissed, preventing her from

exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010). In *Krutzig*, the Eleventh Circuit held that "the unrebutted evidence that the decision maker was not aware, at the time of the decision to terminate Krutzig, of her request to commence FMLA leave establishes as a matter of law that Krutzig's termination was for reasons other than her requested leave." *Id*.

Here, it is undisputed that Taylor decided to terminate Plaintiff, and received approval to do so, approximately three hours before Plaintiff asked Taylor if she could take PTO. (Doc. 97 at 251:4-25; Doc. 96-21 at 49; Doc. 111-1 at ¶ 100). It is also undisputed that Taylor was unaware of Plaintiff's November 9 request to Sedgwick to take baby bonding leave when Taylor decided and received approval to terminate Plaintiff. (Doc. 111-1 at ¶ 105). Like in *Krutzig*, the fact that Taylor was not aware of Plaintiff's requests for leave at the time she decided to terminate Plaintiff, "establishes as a matter of law that [Plaintiff's] termination was for reasons other than her requested leave." 602 F.3d at 1236.

Accordingly, the undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** as to her claim for FMLA interference and that Defendant's cross-motion for summary judgment be **GRANTED** as to this claim.

88

**IV.   CONCLUSION**

For the foregoing reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for sanctions, (Doc. 67), be **GRANTED IN PART AND DENIED IN PART**. Specifically, the undersigned **RECOMMENDS** that the motion be **GRANTED** only as to Defendant's failure to preserve Hajra Kadric's emails and **RECOMMENDS** that, for purposes of the cross-motions for summary judgment, the Court assume that the missing emails would have included the email that Kadric allegedly sent to Stinson and Taylor on October 18, 2018, reporting Plaintiff's injury the day that it occurred. Further, should this case reach a jury, the undersigned **RECOMMENDS** that the Court instruct the jurors that, if they find that Defendant acted in bad faith in failing to preserve Kadric's emails, they may infer that the deleted emails would have included the email that Kadric allegedly sent to Stinson and Taylor on October 18, 2018, reporting Plaintiff's injury the day that it occurred.

The undersigned further **RECOMMENDS** that Plaintiff's motion for summary judgment, (Doc. 104), be **DENIED** in its entirety and that Defendant's motion for summary judgment, (Doc. 107), be **GRANTED IN PART AND DENIED IN PART**. Specifically, the Court **RECOMMENDS** that Defendant's motion for summary judgment be **DENIED** as to Defendant's argument that

Plaintiff's ADA failure to accommodate claim, to the extent that it is based on alleged requests for leave prior to November 9, is unexhausted. The Court otherwise **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to each of Plaintiff's claims.

Because this case presents no other issues referred to Magistrate Judges pursuant to Standing Order 18-01, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED**, this 12th day of February, 2021.

_____

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

90